James C. GOGGIN et al.

v.

William MOSS et al.

Civ. A. No. 2358.

United States District Court
N. D. Texas,
Lubbock Division.

March 31, 1962.

Lyne, Blanchette, Smith & Shelton, Dallas, Tex., for plaintiffs James C. Goggin and Munson G. Shaw Co.

Stubbeman, McRae, Sealy & Laughlin, Midland, Tex., for defendant William C. Moss.

Crenshaw, Dupree & Milam, Lubbock, Tex., for defendants Roy H. Johnston and wife, Marguerite A. Johnston.

DOOLEY, District Judge.

### Findings of Fact

#### I

The plaintiff, James C. Goggin of New York, who was the president of Munson

G. Shaw Company, and the defendant, Roy H. Johnston of Denver, first became acquainted about 1942 or 1943, and shortly afterwards had two or three oil and gas working interest and royalty transactions. In the succeeding years they met casually a few times and would talk tentatively about the prospect of having business dealings again some time, but nothing definite came of it until in the late summer of 1955. About September of that year, Goggin communicated with Johnston by telephone and said that he and his company would be interested in finding some satisfactory oil and gas deals and, by appointment, Johnston went to New York to talk the subject over with Goggin in person, and the outcome of their discussion was that Johnston undertook to see what opportunities he could find in oil and gas ventures which he could recommend to Goggin.

## II

The defendant Johnston, acting on his discussion with the plaintiff Goggin, a short time later, in turn, talked on the said subject to his acquaintance, the defendant William Moss of Midland, Texas, at a Denver Country Club, and Moss, who was experienced in the business of oil and gas operations and development, said he would get busy and see whether he might be able to work up and put before Johnston some deals for submission to Goggin.

## III

In the initial talk aforesaid, between Johnston and Moss, a part of the discussion and agreement was that the two would split 50–50 whatever profits Moss was able to realize out of the deals which might develop through Johnston as medium for Goggin. On this subject Johnston testified, saying: "Well, Mr. Moss said whatever he did, any revenues or profits that were obtained in the dealings would be split right down the middle on a 50–50 basis." (S.F. 11) On the same subject Moss said: "I testified that I had an agreement with Mr. Johnston to pay him 50% of what I was able to clear out on the deals that I turned Roy

H. Johnston." (S.F. 476) This agreement was never communicated to the plaintiffs by either defendant.

## IV

The next stage was that Moss set up a series of deals, five in number, having much overlap of time, and the plaintiffs Goggin and Munson G. Shaw Company, respectively, bought an interest in each of said deals, paying therefor varying sums of money, but not new money every time, as in two instances some or all of the amount paid in on a given deal, which failed, was transferred to another deal, but all told each of the plaintiffs put in on the series of deals more than $100,000.00.

*First Deal*

The first was known as the "Ector County Deal", which came in September 1955. No well was drilled on this land and the lease was abandoned because a well on some adjoining property was being damaged by the intrusion of salt water. The money, totaling $35,000.00, paid in by the plaintiffs was transferred to the "Jones County Deal".

*Second Deal*

The second deal was known as the "Jones County Deal". This came along early in November 1955, followed by drilling begun about the middle of that month and the outcome was a dry hole about the middle of December 1955. The total amount disbursed in the name of said deal was $50,000.00, comprising $35,000.00 from plaintiffs and $15,000.00 from one Wendell Morgan. The $35,000.00 investment made by plaintiffs was spent in pro rata payments upon drilling costs of about $21,000.00, a "bonus" item in the sum of $15,000.00, while the remainder went as pro rata part of equal distributions of about $7,000.00 to Johnston and Moss, respectively.

*Third Deal*

The third deal was known as the "Garza County Deal". It was drilled around the same time as the Jones County well, in November 1955, and repeated as a dry hole. The plaintiffs invested $27,500.00 in this venture, and all of it was spent in

drilling costs and profits to the defendants Johnston and Moss.

*Fourth Deal*

The fourth was known as the "Lea County, New Mexico, Deal". The plaintiffs sent their checks to Johnston totaling $36,500.00 for an interest in this deal, but it was abandoned without being drilled about November 20, 1955, and the said sum received from plaintiffs was transferred to the fifth deal.

*Fifth Deal*

The fifth was known as the "Scurry County Deal". This venture included two separate, but contiguous, tracts of land and an initial well was required on each tract to validate the respective leases. The first well drilled thereon was the No. 1 Birdwell, on the East 100 acres, (one tract of the Stanolind farm-out), which was spudded in about November 28, 1955, and completed as a producer in January 1956. The second well was the McGlaun No. 1, on the West 140 acres, (the other Stanolind farm-out tract), which was spudded in on January 20, 1956, and also completed as a producer on March 3, 1956. The plaintiffs' initial investment here was $36,500.00, (transferred from the "Lea County, New Mexico, Deal"), plus an additional $10,500.00 sent by Goggin, thus making a total initial investment of $47,000.00 on this one deal. Several other wells followed on both of these leases pursuant to the requirements of the Stanolind's farm-out agreement and the McGlaun lease, which called for continuous drilling operations, and the plaintiffs paid further drilling and completion costs until their total outlay on this venture aggregated nearly $200,000.00.

V

The course of action in the foregoing transactions was, in the first four deals, that Moss, without paying any cash purchase money of his own, so far as reflected in the record, acquired in his name the particular lease or leases identified with said deals, respectively, and in the fifth transaction acquired a lease assignment on a one-half interest in part of the property (140 acre tract), and got said farm-out without any claimed money cost to him for either interest, however, in both said instances he did incur personally a drilling obligation, and pursuant thereto drilled the two paying wells mentioned in the last Finding of Fact. The plaintiffs, respectively, invested different sums of money for specified fractional interests in each of the deals, however, the same money served for both of the first and second deals, since the first was abandoned without any outlay. Mention has already been made of Wendell Morgan, (not a party to this suit), who also invested some money for specified fractional interests in the first, second and fifth deals, however, there was no concert of action or joint interest between him and the plaintiffs, but, on the contrary, they acted separately and independently and, in fact, apparently were strangers to each other. Moss took the role of operator in these transactions and had full control of arrangements and supervision over the drilling of the wells on the respective tracts. He contended that he organized and assembled the respective deals in his own right and that then participation therein was tendered through Johnston to the plaintiffs, who, at their option, could take part or stay out of the deal. That version is true, but nevertheless the preliminary activities of Moss were not actually disassociated from the plaintiffs, since each of these deals from the outset was arranged with the plaintiffs in mind and pursuant to the purpose that same would be submitted to the plaintiffs.

VI

The plaintiff Goggin and the defendant Johnston from the outset of their transactions material to this litigation showed the mutual recognition that Goggin and the plaintiff company were in the attitude of investors interested in making profitable investments in oil and gas drilling ventures and the defendant Johnston was in the attitude of being an experienced man in oil and gas deals and one willing to act in behalf of the plaintiffs by efforts to find desirable deals of said kind for

the plaintiffs. The responsibility committed exclusively to the defendant Johnston was the work of making contact with the activities underway in territory where he had ways to get in touch with and examine plans that were forming, or could be put together for drilling operations which he regarded with favor and could arrange an opportunity for plaintiffs to make a participating investment. Johnston's own estimate of his representative capacity for the plaintiffs is reflected repeatedly in his testimony. (S. F. 76–7, 86–7, 134, 148) Further light on the subject is found in the correspondence exhibits. (Plaintiffs' Exhibit 1, letter Johnston to Goggin, dated September 7, 1955) (Johnston's red marked Exhibit 2, letter Johnston to Goggin, dated August 22, 1955) (Defendant Johnston's Exhibit No. 11, marked on back, letter from Johnston to Goggin, dated October 17, 1955) (Plaintiffs' Exhibit 8, letter from Johnston to Goggin, dated October 27, 1955) (Plaintiffs' Exhibit 10, letter from Johnston to Goggin, dated November 26, 1955) (Plaintiffs' Exhibit No. 12, letter Johnston to Goggin, dated January 28, 1956)

Johnston, while acting for the plaintiffs during September and later months of 1955, zealously sought to ingratiate himself with plaintiffs, cultivate their confidence in him, enhance their estimate of his importance and capabilities, and gain their full reliance towards him in his handling deals for them. This studious method can be seen not only in the last mentioned correspondence, but also in other letters. (Plaintiffs' Exhibit 2, letter of Johnston to Goggin, dated September 17, 1955) (Exhibit DJ 22, copy of letter from Johnston to Goggin, dated November 5, 1955) (Plaintiffs' Exhibit 6, letter Johnston to Goggin, dated November 22, 1955) (Defendant Johnston's Exhibit 17, letter from Johnston to Goggin and Munson G. Shaw Company, dated January 4, 1956).

## VII

At first, in the case of the Ector County venture, the plaintiff Goggin reasonably might have understood that the defendant Moss and the plaintiffs, as well as other fractional interest owners, in that deal would be due to bear proportionately, according to their respective fractional interests, the drilling and completion costs of such projected well, (had well been drilled and completed), and plaintiff would have been justified in so believing by the statement of Johnston in his letter of September 17, 1955, marked Plaintiffs' Exhibit No. 2, where it was said that, "Moss pays his ¼th retained interest in ⅞ths working interest of all drilling costs, tankage and operating equipment, as required." That venture, however, was abandoned without any money expenditure. Goggin, not being told to the contrary, had reason to have believed that the same apportionment rule would hold good in the Garza County Deal. The plaintiffs' $27,500.00 was the whole amount collected by Moss for account of said well. The projected depth of the well was 3250 feet and it proved to be a dry hole. The defendant Moss' Exhibit 3, being a letter statement from him to the defendant Johnston on the Garza County operations, dated February 20, 1956, shows a "Drilling Contract" item of $23,000.00, another item is unidentified "Expenses" in the amount of $2,500.00, and another is unidentified "Legal service" $425.00, and the final item "Coring" in the amount of $742.60. It recites the remainder of the original $27,500.00 was $832.40 and it states it had been divided equally between Moss and Johnston. The plaintiffs got no refund. The plaintiff Goggin, although not equally experienced with Moss and Johnston in oil and gas operations, was not altogether a novice, and his general business talents, taken with his actual additional experience and dealings in some oil and gas ventures, should have awakened him to the fact that the plaintiffs had footed all of the expense of the Garza County misadventure. The next venture was the Jones County well, the one with the projected depth of 4800 feet. The plaintiffs put in $35,000.00, Morgan put in another $15,000.00. The Exhibit

DJ 22, letter from Johnston to Goggin, dated November 5, 1955, informed plaintiffs that the estimated cost to drill said well to the casing point was $35,000.00, and that was enough to let the plaintiff know that there was nothing to any notion that Moss was paying a proportionate or other part of the drilling costs. In fact, that estimate of drilling costs was way high. The actual cost, according to Moss, was $20,322.62. The drilling contract (Moss' Exhibit 14), specified the rate of $3.75 per lineal foot for the contract depth of 4800 feet and that would amount to $18,000.00, so that the said estimate, which nearly doubled the actual cost, was plainly out of line, unless on the theory that Moss was amply hedging against the eventuality of being out any personal money on such drilling costs. The present significance, in respect to the wide disparity between the estimated sum and the actual sum of said drilling expenses, is that such circumstance must have made it plainly evident to the plaintiff Goggin that the plaintiffs were paying in a sum much more than enough to cover the drilling costs of the Jones County well. The only other contributor was Morgan, with a payment of $15,000.00. In other words, Moss collected for the account of the Jones County deal $50,000.00, and the means used to run the amount that high was the bogus bonus item of $15,000.00. (A subject to be treated later in full detail) The plaintiffs never received any refund on said operation, but the defendant Moss and Johnston, besides the alleged bonus, also took what they called "advances" of $5,000.00 each, and then split 50–50 the remaining balance of $1,560.19. Defendant Moss' Exhibit 2.

### VIII

The Scurry County deal presented the next and last drilling operation. The first well drilled there, named the Birdwell, was spudded in about December 1, 1955, and was completed as a producing oil well. The drilling contract (Exhibit DM 19), called for a well depth of 6800 feet and a pay rate of $5.00 per lineal foot. The plaintiffs paid in for their part $47,000.00. Wendell Morgan paid in for his part $10,500.00. Nobody else paid in any actual money towards the drilling cost of the well. A second well, named the McGlaun, was the next venture in the Scurry County deal. The drilling job was let to the same contractor used for the first well and the new well, which spudded in about January 20, 1956, was also completed as a producing oil well. The said two wells were drilled on separate leases, respectively. After the Birdwell well was completed, and just a few days before the McGlaun well was commenced, Goggin wrote a letter to Johnston, dated January 16, 1956, (Johnston's Exhibit 8), and in it he was critical of the way Johnston had been handling the business for plaintiffs and said: "You set up these first 2 wells so that Dr. Morgan, the Shaw Company and myself should pay the entire drilling cost, although we can write off only our share of the drilling costs. Why you did this is more than I know, particularly since it was done without my knowledge, consent, or approval." In the meantime, before writing said letter, the plaintiff Goggin had received two letters, both dated January 13, 1956, one from Moss, (Exhibit DM 21), and the other from Johnston, (Plaintiffs' Exhibit 7), and all three letters have to be kept in mind together. In the Johnston letter, he purported to explain how Moss set up the operation on the Birdwell and alleged that the drilling money for the cost of the said Birdwell well had been put into the deal in varying amounts by the two plaintiffs, as well as Wendell Morgan, R. A. Calhoun and himself, Roy H. Johnston. The amounts credited to the plaintiffs were correct, that is Munson G. Shaw Company $18,250.00 and James C. Goggin $28,750.00; and the amount credited to Morgan $10,500.00 was likewise correct, but the respective amounts credited to Calhoun and Johnston, that is $14,375.00 each, was a false representation as neither paid any real money in the deal, and the letter, in another material part, said: "My understanding with Mr. Moss was that if the No. 1 Birdwell was

a commercial oil well justifying the drilling of the west offset on the McGlaun lease, the deal would be on the same basis." And it continued: "It is further understood that if the Birdwell and the McGlaun wells are both completed as commercial, these wells validate the entire 240 acres, and that all future wells are to be drilled and paid for according to each interest held." The Moss letter aforesaid first noted his conclusion that it had become advisable to drill the well required by the McGlaun lease and called on the plaintiffs, if they elected participation, to deposit their share of the funds on or before January 25, 1956, and concluded, as follows:

"Mr. Johnston advises me that he has indicated to you what your share of the McGlaun well will be. It is acceptable to me that you deposit the money with Mr. Johnston, who will advance it to me at the time the drilling contract is let, or no later than January 25."

The plaintiff Goggin, with the said respective letters from Johnston and Moss before him at the time of his own letter of January 16, 1956, manifested his understanding of the two letters he had received by remitting in his response letter $18,250.00 for Munson G. Shaw Company and $28,750.00 for himself as their part in the McGlaun operation. These were the same respective amounts that plaintiffs had invested in the Birdwell well operation.

The above transactions by the plaintiffs as participants in the Scurry County deal, (as in others of the deals), emphasize again the plain fact that the plaintiffs in all reason must have known that their money, (along all but once with that of Morgan), was paying all of the drilling costs of the respective wells drilled in the various deals, to and including the first two wells in the Scurry County deal.

The plaintiffs knew that, during the time the various deals in question were unfolding and running their courses, both Moss and Johnston were giving much time in making contacts, carrying on negotiations, checking geological information and developments in nearby wells being drilled by other owners, attending to clearance of titles, traveling, telephoning, making drilling contracts, and attending to all the other many details in arranging the deals and that this was all being done in a crowded way mainly in November and December 1955 and some in January 1956, and, with that in mind, the plaintiffs were content to acquiesce in and abide the practical reality that the defendants could not be expected to contribute all of their "know-how" and effort without any attendant compensation. In other words, the plaintiffs undoubtedly sensed that when a surplus had been or was left in the amount collected for a given well operation that the defendants Moss and Johnston were keeping some or all of such surplus money for themselves, but what the plaintiffs did not realize was the large amount of the left-over funds kept by the said defendants.

IX

Moss made and delivered to Johnston written statements of expenditures and unspent balances in connection with the respective wells, as evidenced by the example marked Moss' Exhibit 2, in respect to the second deal in Jones County. Moss received a stipulated sum of $50,000.00 to finance the drilling of said well and pay for interests in the venture. $35,000.00 of it came in equal parts from the plaintiffs and the remaining $15,000.00 of it came from Morgan. The said statement shows that only $20,939.81 was spent in operations on the well. The other items charged are a "bonus" of $15,000.00, expenses (unitemized) $2,500.00, Roy H. Johnston (advance), $5,000.00, and William Moss (advance), $5,000.00, thus reaching a new total of $48,439.81. That still left a balance of $1,560.19, which also was disbursed 50–50 to Moss and Johnston. No refund was ever made to plaintiffs of any surplus on that or any other of said deals. There was, in fact, a surplus on each initial well and the money was divided equally between the defendants Johnston and

Moss pursuant to their preliminary agreement. Johnston willfully avoided showing such statements to the plaintiffs. Likewise Moss, who handled and disbursed all the money, never did deliver to the plaintiffs similar statements of the drilling and other attendant costs and disbursements paid out on account of any of these wells and deals, respectively, as same were executed, and plaintiffs were not moved to demand an examination of accounts currently from well to well as drilled, nor until controversy developed some months later. The definite and total amount Moss and Johnston so divided between themselves was $48,872.86, including the disguised "bonus". Such amount is derived from defendant Moss' Exhibits 2, 3, 4 and 6. The contents of those statements simply were not in any way communicated to the plaintiffs.

X

The fact is that the plaintiffs have not made claim in this suit for restitution or other relief on the ground that they contributed disproportionately in paying the actual drilling costs of the several wells, except in the instance of the first McGlaun well. They paid in the same amount for the Birdwell well as for the McGlaun well, and there is no distinction that would entitle them to a better claim for restitution from the one well than from the other, and they make no claim for any such restitution in respect to the Birdwell well. They also stood by during the whole succession of wells, starting with the Jones County well, then the Garza County well, and then the Scurry County Birdwell No. 1 well, without raising any issue of being entitled to some restitution on the sums paid over in connection with any one or more of said wells.

XI

The defendant Moss consistently insisted that he was managing these deals on what he called a "turn-key" basis, that is, he was in charge and put the deals together as the owner of the lease or leases on the land made ready for the particular test drilling operation and that he had the right to fix the terms for others to come into the venture and did that by assigning interests on whatever terms were agreed, that is, a certain fractional interest in the deal for a specified consideration, and with the intent to see it through, at least, the stage of test drilling. He did carry out that pattern in form with respect to deals here in question. Letter agreements of such type, relative to the Garza County and the Jones County wells, respectively, are found in Exhibits DM 8, 9, 12 and 13. The way it worked though, in actual practice, Moss in fixing the amount to be paid by plaintiffs for an interest in a given venture set a figure gauged somehow in relation to his overly estimated cost of the lease operations, primarily drilling costs. Exhibits DJ 22 and 24, Exhibits DM 21 and 23, Plaintiffs' Exhibits 2, 7, 44, 45, 46 and 47.

XII

The plaintiffs, however, do make an additional claim to recover alleged overpayments on their part in connection with the drilling, completion and equipping of later Scurry County wells, that is Birdwell No. 2 and McGlaun No. 2 and No. 3, respectively. In late December 1955, the defendant Moss mailed to the plaintiff Goggin a letter dated December 22, 1955, reciting that he was enclosing a letter agreement for execution by the plaintiffs (Exhibit DM 20). The said draft of the letter agreement was dated December 21, 1955, addressed to the plaintiffs, respectively, and was signed by Moss, being Johnston's Exhibit No. 15. It related to the Scurry County deal and recited that same evidenced the ownership by Goggin of an undivided 115/460 and Munson G. Shaw Company, Inc., of an undivided 73/460 interest in and to the working interest held by Moss in the leases covered by said deal and it also recites that if the well then being drilled on the land turns out to be worth completion "you agree to pay your proportionate part of all costs which will be incurred in completing, casing and equipping said well." The copy of said letter agreement which was introduced in evidence bears

only the signature of Moss, but the record otherwise shows that same was signed by the plaintiffs on January 16, 1956, and was back-dated to December 30, 1955. There is no dispute between the parties that the plaintiffs having paid a predetermined sum certain for a designated fractional interest in any given deal, the additional amount they were to pay, in event of production, abided the event and then would be limited to an amount determined by the matching fractional part and pro rata of the indeterminate costs incurred in completing and equipping any such productive well. That marks a distinction, which also held good in respect to succeeding wells on a producing lease, such as the three additional wells on the Scurry County leases. About December 1, 1956, the plaintiffs, desiring to know with more certainty the state of accounts relative to the series of deals in question, retained a firm of certified public accountants to make an audit, and the accountant had access to the records in the office of the defendant Moss. The outcome of that audit is compiled in Exhibit DM 39 and plaintiffs' Exhibit 42. The report shows that the plaintiff Goggin is entitled to recover a due balance of $3,254.84, and the plaintiff Munson G. Shaw Company, Inc., is entitled to recover a due balance in the sum of $2,066.05 of the money Moss collected from them in connection with Birdwell well No. 2 and McGlaun wells Nos. 2 and 3. The parties do not question the accuracy of the accountant's computations.

### XIII

The focus of this controversy converges mainly on the Jones County and Scurry County ventures, which were virtually concurrent. Each will be reviewed again, and in more detail this time. The plaintiffs each invested $17,500.00 in the Jones County deal and Morgan invested $15,000.00 in that deal. A ¼ interest was credited to each of the plaintiffs and for some unexplained reason Morgan was likewise credited with a ¼ interest, although he paid $2,500.00 less into the deal. There seems some confusion about how many leases were put into the deal, but, at any rate, they were all relatively small tracts of land. Moss, in letters a month apart to Goggin and Morgan listed 4 leases, Exhibits DM 12 and DJ 21. However, when Moss later procured quitclaim deeds from the respective plaintiffs to the Jones County tracts in late 1955 only three leases seem to be covered in the references to the public records, Exhibits DM 15 and 16. In letter of November 5, 1955, from Johnston to Goggin, only two tracts are mentioned, one the 80 acres and the other 63.4 acres. Exhibit DJ 22. The well was drilled on the tract of 63.4 acres and proved to be a dry hole. This was known by not later than December 15, 1955. On December 17, 1955, Moss wrote Johnston a letter, stating an account of the expenditures on the said Jones County well to that date, and same showed a balance then left of $37,822.62, out of the total of $50,000.00, which Moss and Johnston had collected from the plaintiffs and Morgan. One of the items reads: "Bonus 15,000.00". Exhibit P 26. Then, by letter dated February 20, 1956, from Moss to Johnston, a final statement was rendered and again the bonus item was set out, but there were two new items under the head of "Advances", showing $5,000.00 each paid to Johnston and Moss. Exhibit DM 2. The first time there was any mention of a bonus to the plaintiffs, in connection with this deal, was in the above letter of November 5, 1955, from Johnston to Goggin, which was a bare reference without any explanation. Johnston in such action purposely withheld from Goggin any knowledge that the purported bonus was really to go in the purchase of the oil payment being bought for the equal interest and ownership of Moss and Johnston, which will be further mentioned below in connection with the Scurry County deal. No bonus was in fact paid by Moss to any lessor or other person in consideration for any one or more of whatever leases Moss may have acquired for the purposes of the Jones County deal. Moreover, none of said leases cost Moss a money consideration in any amount.

## XIV

The leases Moss assembled for the Scurry County deal had a fairly complicated origin, but it can be traced satisfactorily in the record. The land in question was in two contiguous tracts, that is, the West 140 acres and the eastward adjoining 100 acres, making together the West 240 acres of the South ½ of Section 177. The oil and gas leasehold interest on a ½ mineral title in the 140 acre tract was owned by the Stanolind Oil and Gas Co., subject to an outstanding oil payment interest in the sum of $35,-000.00, and one McGlaun owned the other and unleased ½ mineral title in said tract, and lastly the oil and gas leasehold interest in the 100 acre tract was owned by said Stanolind under a single lease covering also the remaining 80 acres of said ½ section. The said lease was burdened with an outstanding oil payment interest in the sum of $90,000.00. Moss negotiated a farm-out contract with Stanolind covering its ½ leasehold interest in the West 140 acres and its full leasehold interest in the adjoining 100 acre tract. This left Stanolind owning the lease on the East 80 acres of the half section subject to the $90,000.00 oil payment. Moss was not out any cash consideration to Stanolind. It stipulated, however, for adequate consideration for its interest, such as the reservation of a ⅛th of ⅝ths overriding interest and part of all oil, distillate, condensate gas, and other liquid and gas hydrocarbons produced from the leasehold acreage, and ⅛ of all the working interest portion of all other production, and the requirement for a successive drilling program, and also the reservation of various valuable options, which it might choose to exercise. The Stanolind further got the benefit of such development fairly nearby the said 80 acre leasehold which it still retained in the ½ section, and on top of all that said lease interest was cleared of the oil payment liability by Moss' action in converting the two existing oil payments into a single one for the total amount of $125,000.00 and impressing it exclusively against the West 240 acres of the half

section. (The Partial Assignment of Oil and Gas Leases Form contained as part of Johnston's Exhibit 15) This ingenious move concentrating the oil payment load on the leases of concern to the plaintiffs and freeing the 80 acre lease of Stanolind was against the best interest and to the detriment of plaintiffs.

Moss also acquired an assignment of a lease executed by McGlaun to one Barrett (acting for Moss), covering the other ½ interest in the West 140 acre tract. Moss again was out no cash consideration for said lease and the assignment of it to him so far as shown by the record, but McGlaun did have adequate consideration in the respect that under the terms of his lease he retained a net overriding royalty interest amounting to ¹⁄₁₆th of all the oil and gas produced, saved and sold from the said 140 acre tract and unaffected by the fact that he owned only an undivided ½ leasehold interest, and the lease also required, on penalty of termination, that a well be commenced on said premises within a limited and short time, and a further condition required that a continuous drilling program be thereafter prosecuted on said premises, and finally stipulated for a release of the Stanolind farmout as to any part of the land on which said lease may become terminated.

## XV

The plaintiffs at the outset had made up their minds to take part in some oil and gas drilling ventures, but due to certain tax considerations in respect to the supposed bearing of intangible drilling costs taxwise, they wanted any such deals to be in actual execution not later than November 30, 1955. The Jones County and the Scurry County deals were companions in the planning stage and also close together in the drilling stage. Moss and Johnston utilized the Jones County Deal as a stepping stone in the Scurry County Deal. The Jones County Deal inherited the $50,000.00 made up of $35,-000.00 from plaintiffs and $15,000.00 from Morgan, put in for the Ector County Deal, which was abandoned. The plaintiffs remitted their $35,000.00 to

Moss in early October 1955, and on receipt he deposited such money and kept same in his special account at the First National Bank of Midland until November 1, 1955. In the meantime, about the middle of October, Moss made an opening contact with the Stanolind Oil & Gas Company and the negotiations so initiated led to a farm-out, which became a part of the Scurry County Deal a few weeks later. While that was going on, Moss was also shaping up the Jones County Deal. Goggin sent in no more money during the growing delay, without any progress action, shown in the Ector County Deal. The payments on deals, however, were resumed shortly after the Jones County well was spudded in on or about November 11, 1955, as evidenced by checks issued November 16, 1955, two for $18,250.00 each and two for $13,750.00 each, covering payments for account of the Garza County and Lea County Deals. In fact, Moss and Johnston decided that it would be best to abandon the Ector County Deal. Instead of returning the Ector County money, they decided to interest the plaintiffs in accepting a substitute venture in lieu of the Ector County Deal. The Jones County Deal was selected to serve that end. The Jones County operation projected a comparatively shallow well of 4800 feet depth, where the Ector County proposal had projected a deeper well. It was highly important to the plans of Moss and Johnston that the proposed substitution prove satisfactory to Goggin. That was a key desideratum in their set up of the pending Scurry County Deal. The defendants Moss and Johnston already had in vision the acquisition of the oil payment interest in the lands of the Scurry County Deal. The $35,000.00 the plaintiffs put up for the Ector County venture was identified in their mind with the drilling costs of that abortive venture. This was known to Moss and Johnston and made it awkward and uncertain to presume that plaintiffs would passively agree to spend the same amount for a substitute interest in the Jones County Deal. If plaintiffs, maybe, knew that Morgan had come into the Ector Deal for $15,000.00, they would have reason to demur to any rating of estimated drilling costs at an inflated figure of $50,000.00 for said substitute deal. At any rate, whatever their dilemma, Moss and Johnston were men in a hurry. They met the situation by resorting to the artifice of a "bonus" item for $15,000.00, as though Moss had been or was being required to make such an outlay to acquire the lease or leases desired for the Jones County Deal. This expedient was hit on some earlier than November 1, 1955, and during the first half of that month, Moss and Johnston were working together energetically on the Jones County and Scurry County Deals. This was the intensive period. Much of their collaboration was in Moss' office. Both of them had the intent to make use of the "bonus" money to purchase for their joint and equal interest the two oil payment liabilities against separate parts of the leasehold interests that were destined to make up the Scurry County Deal. To that end, on November 1, 1955, Moss issued and delivered his check to Johnston in the sum of $35,000.00 and thereby, on his own volition, transferred the sum he had received from the plaintiffs in early October. (Exhibit P. 3) The identity of the money was noted on the face of the check. Johnston then, on the same day, deposited the money in his own therewith opened bank account at Midland. Both Moss and Johnston well knew the money did not belong to either of them. (Exhibit DJ 30) He also deposited in his account at the same time an additional sum of $15,000.00 which came from Morgan for the Ector County Deal. In other words, the said two amounts held by Johnston were commingled in his account. On November 2, 1955, Moss obtained from Schkade an option, (Exhibit DM 40), to purchase the two oil payment interests aggregating $125,000.00 at the purchase price of $15,000.00, and put his payment check of that amount, (Exhibit DM 43), in the bank in escrow along with the Schkade assignments, (Plaintiffs' Exhibits 20 and 21), subject to directions that the bank deliver said assignments to Moss, if he elect-

ed to make the $15,000.00 purchase payment by November 15, 1955. Moss immediately proceeded with his well advanced negotiations to conclude the farm-out transaction with Stanolind Oil & Gas Co. Then on November 5, 1955, when the Scurry County Deal was well under way, Johnston checked out to Moss, by separate checks, $30,000.00 marked "Jones Co. Tx." and $15,000.00, marked "Bonus Jones Co. deal". The Johnston account at the time still had in it the opening credit of $50,000.00, (Johnston Exhibit 35), derived from plaintiffs' $35,000.00 and Morgan's $15,000.00, which were deposited November 1, 1955, so said two checks could be paid only by going against said commingled $50,000.00, and that left $5,000.00 of said total in the Johnston account, but a little later that also was checked out by Johnston to Moss. The two Johnston checks were deposited by Moss on November 7, 1955, in his special bank account. Meanwhile, plaintiffs knew nothing about their money being shunted back and forth between Moss and Johnston, as aforesaid. On the already noted November 5, 1955, Johnston also diligently set about to forestall any hesitation on the part of the plaintiffs by trying to sell them on the new Jones County Deal with the argument that it was really and definitely better and more attractive than had been the discarded Ector County Deal. His selling thrust was mounted in his letter of that date to Goggin and identified as Exhibit DJ 22. In upholding the claimed superior promise of the proposed Jones County Deal over the Ector County Deal, the points he made were (1) that one of the best geologists had recommended the new deal, and (2) that the two tracts, one of 80 acres and the other of 63.4 acres, were offset by producing wells on the west, on the north and on the east, and thus the property was proven and would produce from two horizons, and (3) that he, Johnston, had already contracted to drill the first well on the 63.4 acres tract, and (4), that the minimum ultimate production would be 5,000 barrels per acre on 40 acre spacing, which would mean at least 200,000 barrels per well of 40° gravity at $2.95 per barrel, and (5) that this new deal would be approximately equal in participant cost to the other deal "excepting, that where you had a ⅜ interest in the Ector County Deal, it worked out that your assignment would be for ½ interest, or ⅘ in this deal." He then summed things up saying that the new deal "could have twice the value of the Ector County play." The simple mention of a "bonus" might well prompt the thought that it bespoke a very valuable lease. A similar letter of the same date to Morgan made known that his interest in the new deal would be a ¼ instead of a ⅛ as scheduled in the Ector County Deal. (Exhibit DJ 21) For some reason Moss was ready voluntarily to make an exceptional concession in this Jones County Deal, that is, it was the only time in the respective deals that he had been content to retain for himself so little an interest as ¼. Another strange circumstance is that since Johnston wrote said letter, extolling the Jones County Deal, to Goggin, and also paid over the plaintiffs' money to Moss on the same date, November 5, 1955, he thus had parted with the plaintiffs' money before they were informed of the particular terms and prospects of the said deal. The plaintiffs, in effect, were obstructed in their right to accept or reject proposed deals beforehand. This is pointed up again by the fact that the plaintiffs' money, received from Johnston by Moss on November 5, 1955, was deposited by him two days later in his bank account, and then, without waiting for a letter reply from plaintiffs to Johnston's letter of November 5, 1955, Moss wrote letters to the plaintiffs, Goggin and Munson G. Shaw Company, opening with a recital "that you have this day purchased and paid me $17,500.00 cash for an undivided ¼ working interest" in the Jones County transaction. The plaintiffs, as requested by Moss, noted their approval at the bottom of said respective letters. (Exhibits DM 12 and 13) The well, in fact, already had been spudded in

at the direction of Moss before his said two letters were written to the plaintiffs.

## XVI

On the same often mentioned date of November 5, 1955, Johnston wrote a second letter to Goggin, this time in reference to the Scurry County Deal. (This letter is included as part of the contents in plaintiffs' Exhibit 5) Johnston therein put before the plaintiffs a proposal that they buy a certain interest in the deal for $57,500.00. The plaintiffs declined that suggestion and limited their participation to $47,000.00. Further in such letter Johnston said, "In order to obtain these leases we must assume a $125,000.00 oil payment imposed upon Stanolind at the time they acquired the lease, in addition to the landowner's regular ½ royalty and the interest which will be reserved by Stanolind." and went on to predict that the oil payment would be disposed of rapidly, "after which that ⅛ reverts to our joint interest." That letter was also written in Moss' office by his secretary. Moss retained a copy of each of the two November 5, 1955, letters from Johnston to Goggin. Johnston's statement about "we" assuming the $125,000.00 oil payment was rank deception against the plaintiffs, as both he and Moss well knew, for there was not the slightest intent that either of them would assume any of such oil payment. Instead it was the design right at that time that said oil payment would be acquired by the "bonus" money and owned equally by Moss and Johnston. Johnston deliberately concealed said fact from the plaintiffs. Moss was quite confident, after a visit in early November 1955 at Stanolind's Abilene office, (S. F. 175–6), the farm-out deal would be forthcoming, and true to that expectation he received same from Stanolind on November 17, 1955, and two days before he had paid, by the previously deposited check on his bank account, the $15,000.00 consideration to Schkade for the oil payment assignments. The bank records of the First National Bank of Midland not only show a debit against Moss' account for said payment of $15,000.00 on November 15, 1955, but also show that there would not have been near enough balance in the account to have paid over a minor fraction of said check without recourse to the $45,000.00 of the plaintiffs' and Morgan's money, which Johnston checked out to Moss on said date of November 5, 1955. Moss' bank statement from the First National Bank of Midland, (Exhibit DM 44), covering the period from October 13 to December 29, 1955, reveals two debit items, one for $15,000.00 and the other for $35,000.00 on November 2, 1955. Obviously that withdrawal is identified with Moss' two checks of November 1, 1955, payable to Johnston, one covering money which came from Goggin and the Company and the other covering money which came from Morgan. (Plaintiffs' Exhibits 3 and 68) That withdrawal reduced Moss' said bank account to $3,250.00. The next day same was reduced some more and became $2,150.00. Then on November 7, 1955, Moss made a deposit of $45,000.00, and the balance became $47,150.00. Obviously that deposit covered Johnston's two checks dated November 5, 1955, to Moss, one for $30,000.00 marked, "63.4 Ac. Tract Jones Co. Tx." and the other for $15,000.00 marked, "Bonus 63.4 acres Jones County Deal". (Exhibits DJ 31 and 32) Then, the bank statement shows a $15,000.00 debit item on November 15, 1955, leaving a balance of $32,150.00. This withdrawal was paid in purchase of the two oil payment interests which Moss and Johnston were buying for their joint and equal ownership. (Exhibit DM 43) The only money Moss had in said bank account at the time, from a source or sources other than the plaintiffs and Morgan, was the sum of only $2,150.00. The said oil payment interest when bought was intended by both Johnston and Moss to be for the equal benefit and ownership of each, but the assignment from Schkade named Moss only as assignee. (Defendant Moss' Exhibit 1) True intent of ownership was also evidenced some time later when Moss, at Johnston's direction, ex-

ecuted his assignment for the one-half interest in the oil payment interest to Johnston's wife. (Exhibit P. 22). Both Johnston and Moss in their testimony refer such division to their original agreement that everything which would be worked out of these deals would be divided half and half between them. (S.F. 11 and 476) This also has some apparent confirmation in writing. (Exhibit DM 11) Moss knew at the time of this oil payment transaction that Johnston was the agent of the plaintiffs and that they were relying on their agent to loyally care for the interests of his principals with undivided allegiance and no self-interest conflicts, but he did not communicate with the plaintiffs on the subject of said agent's authority at or before making such oil payment purchase with the money he got from Johnston. Johnston at all times well knew that his principals were relying on him to handle their business faithfully, and without any deception, double dealing or adverse interests, and, in fact, he sedulously cultivated the confidence and trust of his principals with professions that their welfare was foremost in his mind. The plaintiffs did fully trust and rely on Johnston to report truthfully all the material facts about their business handled by him, such in particular as the Jones County Deal and make recommendations actuated wholly by a straightforward concern for their welfare and with unmixed fidelity of judgment. He was recreant to that trust and by his fraudulent deception and concealment of adverse self-interests he misled the plaintiffs into accepting said deal with its attendant fictitious "bonus" element, when, except for his concealments, misrepresentations, and selfish recommendations, the plaintiffs would not have been inveigled into that deal. Moss knew as well as Johnston the steps taken in forming and promoting the Jones County deal and had an active part in it himself.

### XVII

The first mention to the plaintiff Goggin of any oil payment interest against the Scurry County lands was in the letter from Johnston to Goggin, dated November 5, 1955, being a part of that bound sheaf of papers marked Plaintiffs' Exhibit No. 5, and in that letter he said:

"In order to obtain these leases we must assume a $125,000 oil payment imposed upon Stanolind at the time they acquired the lease. * * * however, the oil payment will be disposed of rapidly under the development program anticipated, after which that 1/8 reverts to our joint interest."

Johnston in the above letter excerpt just put a false front on the real self interest designs which he and Moss had in mind about the oil payment interest. That purpose has already been dealt with in the next above finding. The next time that Goggin received any word about the oil payment was through the Letter Agreement of December 21, 1955, written to the plaintiffs by Moss, (Johnston Exhibit No. 15), which was accompanied by a short covering letter, (Exhibit DM 20), but the reference to said subject was indirect, that is, the subject of the oil payment is found not in either of the letters just mentioned, but, instead, in the attached title opinion of attorneys at Midland, Texas. The title opinion reflected an outstanding oil payment interest in the name of Moss for $125,000.00. In fact, at the time of the title opinion, this was not a single interest, but rather the sum of one oil payment interest in the amount of $90,000.00 and another in the amount of $35,000.00 on separate leases, respectively. The two were later combined by Moss. It has been noted previously that the said Letter Agreement of December 21, 1955, was executed by the plaintiffs on January 16, 1956, but antedated to December 30, 1955. The plaintiffs shortly began to have misgivings about the said oil payment and on March 2, 1956, Frank Dolan, as representative of the plaintiffs, sent a telegram to Moss, saying that he would arrive in Midland, Texas, on March 4, 1956. Defendant Moss, in telling about Dolan's visit, said that Dolan first "seemed somewhat suspicious of me," and asked to see his work and business files, which were laid before

Dolan for examination, and the witness further stated "He queried me at that time about the oil payment, and I told him the entire background, gave him the entire chain of title." In fact, such disclosures as were made by the witness Moss to Dolan did not include any mention of the source of the money used by Moss in buying the two oil payments which were merged by Moss into one aggregate oil payment. Under date of June 29, 1956, the defendant Moss wrote a letter to the plaintiffs on the subject of an operating agreement for the purposes of conducting the business of the day to day operations in producing and marketing the oil being produced on the Scurry County leases, and the original and two copies of such a proposed agreement were enclosed with such letter. (Exhibit DM 28) The matter then lingered for a considerable time and the hindrance in the minds of the plaintiffs was that they questioned the right of Moss to hold the oil payment burden on the production from said leases. They still, however, did not know the whole truth about the transaction as to the purchase of such oil payment interest. For instance, under date of April 18, 1956, the plaintiffs wrote a letter to Mr. L. F. Walker of the Magnolia Petroleum Company in Dallas, Texas, and enclosed therewith some signed Division Orders covering production from the Scurry County leases, saying that they were doing so rather than hold up royalty oil payments, but with the reservation "However, we are not quite clear on the $125,000.00 oil payment and Stanolind's option to convert to a ⅖ working interest in relation to our shares." (Plaintiffs' Exhibit 61)

### XVIII

The plaintiff Goggin in person discussed this oil payment again with Moss at Los Angeles in May 1956, trying to get a concession on it from Moss, but to no avail. (S.F. 431) The need for an operating agreement, which was brought up by Moss in June 1956, had been marking time, but under date of September 19, 1956, the plaintiffs, by their representative Dolan, wrote a letter to the defendant Johnston, with a copy to the defendant Moss, saying the operating agreement previously submitted by Moss had been signed by Goggin and that Dolan personally would deliver same to Mr. Moss on October 1, 1956. On or about that date Dolan brought the operating agreement and met with Moss at Midland. But, in the meantime, the text of the agreement, as originally submitted by Moss, had been amended at the instance of Goggin by a reservation addendum, reading as follows:

"Provided, however, it is determined that William Moss is entitled to such a production payment inasmuch as there exists a dispute between operator and nonoperators concerning operator's ownership of $\%_{64}$ of ⅝ working interest, and his claim to a production payment of $125,000, the parties hereto further agree that nothing herein shall constitute a waiver of nonoperators' position with respect thereto against operator, and if it is determined that the operator is not entitled to $\%_{64}$ of ⅝ working interest, the working interest of the parties hereto set forth above, shall increase proportionately without regard to the production payment of $125,000, or whatever amount that production may or may not be."

In the ensuing discussion between Dolan and Moss, regarding said desired amendment, Moss was adamant against it and Dolan finally yielded by striking out the proposed amendment, and delivered said executed operating agreement to Moss. Neither the plaintiffs knew nor was Dolan told at the time of said meeting between Dolan and Moss, the actual facts about how Moss had bought the said oil payment interest, as said facts are stated elsewhere herein. Goggin remained in ignorance of the true facts in this matter until the evidence developed same in the trial of this lawsuit.

### XIX

The West 140 acres of the 240 acres in the Scurry County Deal proved to be the

most productive part of the land. The three McGlaun wells were drilled on that tract. The two Birdwell wells were drilled on the East tract of 100 acres. The said East 100 acres, together with the adjoining 80 acres to the east, were subject to the $90,000.00 oil payment interest and the said West 140 acres tract, to the extent of a ½ interest only, was subject to the $35,000.00 oil payment interest. Moss, in setting up the Scurry County Deal, acquired the McGlaun lease on the said unencumbered ½ interest in the West 140 acres tract. That lease was not subject to any pre-existing oil payment. Moss, however, revamped the two existing oil payment interests by combining same into a single $125,000.00 oil payment interest, and expanded the coverage of same by subjecting thereto the previously unencumbered ½ interest in the West 140 acres aforesaid, in addition to the other ½ interest in said tract already subject to the original $90,000.00 oil payment. This was done in the assignments of interest made to the plaintiffs, respectively. (Plaintiffs' Exhibits 24 and 25) If the two original oil payment interests had remained separate, the production payments accruing to the plaintiffs on the West 140 acres would have been greater since ½ of the production would have been allocable to the ½ leasehold interest which would have remained unencumbered. In other words, such action of Moss materially lessened the current working interest income of the plaintiffs from the most productive part of the property, while Moss and Johnston conversely gained an increased income. A reference here is made to the Plat Sheet contained in Plaintiffs' Exhibit No. 5.

## XX

In the light of the testimony of a graduate geologist, the finding is here made that the combined oil payment of $125,000.00 had yielded about $65,568.00 around the 9th of December 1959, and, judged by the economic factors involved, the amount to accrue for payment under said oil payment interest during the ensuing five years after the above date was reasonably expected to be $38,668.99, and the present market value thereof at the time of the trial was about $30,000.00. (S.F. 382–4) Moss testified that his receipts from the ½ of the oil payment owned by him had amounted to $32,833.19 as of October 31, 1959. (S.F. 326) Johnston testified that the receipts from his ½ of the said oil payment had averaged, perhaps, $500.00 a month at the time of the trial, and that he believed the full amount received had been about $20,000.00 (S.F. 54) His figures evidently were a substantial underestimation. There is no evidence presently before the Court of the actual yield from said oil payment interest since the trial of this lawsuit.

## XXI

The assignment of the ½ part in the oil payment interest from Moss to Margaret Johnston was made simply at the direction of Roy Johnston and there was no consideration for it from the said assignee.

## CONCLUSIONS OF LAW

### I

The defendant Johnston, as mutually understood, acted as agent for the plaintiffs during the course of all the activities on his part in connection with the several deals and ventures in question arranged through the defendant Moss.

### II

No mining partnership was formed between the plaintiffs and the defendant Moss, or the defendants Moss and Johnston, in the instance of any of said deals and ventures and the attitude between the plaintiffs and Moss was not a strict fiduciary relationship.

### III

The plaintiffs are without any cause of action to recover a judgment in recoupment against the defendants due to disproportionate outlay for drilling or other expenses in the drilling operations on the Jones County well, the Garza County well and the Birdwell No. 1 well or the McGlaun No. 1 well.

## IV

■ The plaintiffs are entitled to judgment against the defendant Moss in the sum of $3,254.84 for the plaintiff Munson G. Shaw Company, Inc., and $2,066.05 for the plaintiff Goggin to adjust disproportionate outlays for drilling, completing and equipping the Birdwell well No. 2 and the McGlaun wells Nos. 2 and 3, pursuant to Finding of Fact XII hereinabove. (The above Finding was not executed in the judgment).

## V

■ The defendant Roy Johnston, in consequence of his actions breaching the fiduciary relation and duty he owed to the plaintiffs, as reflected in his fraudulent deception, concealment and adverse self-interest conduct recounted in the foregoing Findings of Fact and most fully in Finding XVII, is liable to respond in law and equity for his misdeeds and the just and proper remedy is that the plaintiffs have judgment against said defendant and his wife, the defendant Margaret Johnston, as constructive trustees, for $^{35}/_{50}$ths of the amount of money they, or either of them, have received and collected, and that has accrued to either of them, or his or her designee, as proceeds paid on the $\frac{1}{2}$ share of the $125,000.00 oil payment interest which the defendant Roy Johnston caused to be assigned and conveyed to his wife, without consideration, and further judgment vesting in the plaintiffs a $^{35}/_{50}$th interest and title in and to the defendants' $\frac{1}{2}$ part of said oil payment interest, and that said defendants be directed and ordered to execute and deliver a good and proper assignment and conveyance sufficient and effective to evidence such aforesaid right and title of the plaintiffs.

## VI

■ The defendant William Moss, in consequence of his concerted action with the defendant Johnston to exploit the purported "bonus" in the Jones County Deal and use the sum to purchase the oil payment interests in the Scurry County Deal, done when he knew that Johnston was the agent of the plaintiffs and that they relied on him for trustworthy, candid, and straightforward service, as recounted in the foregoing Findings of Fact, and most fully in Finding XVII, is liable, whether or not an outright fiduciary, to respond in law and equity for his misdeeds, and the just and proper remedy is that the plaintiffs have judgment against said defendant Moss, as constructive trustee, for $^{35}/_{50}$ths of the amount of money he has received and collected, and that has accrued to him, or his designee, as proceeds paid on the $\frac{1}{2}$ share of the $125,000.00 oil payment interest, which the defendant Moss still held after the assignment of the other $\frac{1}{2}$ interest therein to the defendant Margaret Johnston, and further judgment vesting in the plaintiffs a $^{35}/_{50}$th interest and title in and to the defendant Moss' $\frac{1}{2}$ part of said oil payment interest, and that said defendant be directed and ordered to execute and deliver a good and proper assignment and conveyance sufficient and effective to evidence such aforesaid right and title of the plaintiffs.

## VII

The money recoveries declared in the two foregoing Conclusions of Law shall bear the legal rate of interest successively from the dates when each respective receipt of oil payment money was collected or subject to collection by the particular defendant.

## VIII

■ In view of the Fraudulent and flagrant misconduct of the defendant Roy Johnston, he is liable to the plaintiffs in exemplary damages and the reasonable amount thereof to be recovered by the plaintiffs is $5,000.00.

## IX

The plaintiffs are entitled to the further requirement that the defendant Johnston and his wife and the defendant Moss, respectively, do make a full, true and verified accounting of all the receipts and income they have realized, or could have realized, or caused to be collected, under the two halves, respectively, of said oil payment interest and estate.

## X

The money parts of the judgment will bear legal interest from the judgment date until paid, and the costs of court are to be taxed ½ jointly and severally to the plaintiffs, and ½ jointly and severally to the defendants.