**W. H. ROQUEMORE**

v.

**FORD MOTOR COMPANY.**

Civ. A. No. 4–460.

United States District Court
N. D. Texas,
Fort Worth Division.

May 30, 1967.

Andress, Woodgate, Richards & Condos, by William Andress, Jr., Dallas, Tex., for plaintiff.

White, McElroy & White, by B. Thomas McElroy, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

BREWSTER, District Judge.

This diversity action arose out of a transaction wherein the plaintiff, W. H. Roquemore, was engaged by the defendant, Ford Motor Company, to negotiate for the purchase by it of a suitable site for a truck sales and service center in Fort Worth, Texas.

The respective theories of the parties are set out in detail in the pre-trial order, and they will be only briefly summarized here. The quotations in such summaries will be from the pre-trial order.

Roquemore's theory is that Ford "hired him to act as its dummy or front man in acquiring a suitable site for its truck sales center, without public disclosure of Ford's interest, at a price

which would be satisfactory to Ford, and he would be compensated by the spread if he could buy the property for a price below what Ford approved"; that he did find and tie up a piece of property acceptable to Ford within its price limit of fifty cents a square foot; that after he procured the zoning adjustments necessary to legalize Ford's intended use, Ford refused to purchase the property, thereby causing him to lose the profit of $120,000.00 that he would have made out of the transaction. He credits the $120,000.00 with a $17,500.00 profit he made by negotiating a sale of the property to another purchaser after Ford declined to buy it, making his demand for damages the sum of $102,500.00.

Roquemore makes no claim that the alleged agreement between him and Ford whereby "he would be compensated by the spread if he could buy the property at a price below what Ford approved" was in writing, or that Ford ever signed any written contract *obligating* it to purchase the property. It is undisputed that the only written agreements signed by Ford involving the property were the two option contracts hereinafter discussed.

Ford denies that there was ever any agreement by it to purchase the property or to compensate Roquemore by allowing him "the spread if he could buy the property for a price below what Ford approved". It says that even if there had been such oral agreements, as alleged by Roquemore, each of such agreements would have been unenforceable—the one for the purchase of land, under the Statute of Frauds, Article 3995, subd. 4, Texas Civil Statutes, and the one for payment of compensation for Roquemore's services as a real estate agent, under the Real Estate License Act, Article 6573a, subd. 28, of such statutes. Further defenses asserted by Ford were that Roquemore was acting as its agent in the negotiations for the purchase of the property and that his conduct during the transaction amounted to a breach of his fiduciary duties; that the only contracts Ford ever entered into in connection with the property were the two written ones, each of which gave it only an option to buy; that such written contracts control over any claimed oral agreements; and that Ford terminated such contracts when it declined to exercise the options provided therein. By its cross-action, Ford claims that Roquemore's breach of his fiduciary relationship entitled it to recover the $5,000.00 it advanced to him to use as earnest money in the transaction.

The Court is of the opinion that the facts and the law support the above stated positions of the defendant, and that judgment should be rendered in its favor denying the plaintiff's claim and giving it judgment against the plaintiff for $5,000.00.

About May 1, 1964, Ford became interested in acquiring suitable land in Fort Worth, Texas, for the location of a truck sales and service center. It felt that the negotiations for the purchase should be conducted by a real estate broker without disclosure of its identity, so that landowners approached would not be tempted to ask exorbitant prices for their property. It contacted Roquemore of Dallas, Texas, a real estate broker duly licensed under the Texas Real Estate License Act, Article 6573a, and he agreed to act for Ford in negotiating for the purchase of a suitable tract without divulging that Ford was involved. Ford made it clear to Roquemore that while it would not be interested in any property costing more than fifty cents a square foot, it wanted to buy the property at the lowest possible figure. That was of particular importance to Ford because it was planning to have its dealer develop any site purchased by it, with the dealer financing to be guaranteed by Ford. It also informed him that the proposal for the purchase of any property would have to go through established channels of the Ford organization, and that Ford would not be bound to buy until the deal had been finally approved at the home office.

During the course of these early discussions, one of Ford's representatives told Roquemore of a likely site he had seen in Fort Worth with a "For Sale" sign on it. Roquemore investigated and found it was a vacant tract of 12.373 acres owned by W. T. Priddy. One Greenwood, a real estate broker in Fort Worth, was a close friend of Roquemore's because of the fact that Roquemore had allowed him to broker land deals throught Roquemore's office and name during a period when Greenwood could not operate openly on account of trouble he was having with the State over his real estate broker's license. Roquemore had Greenwood contact Priddy for a listing, and Greenwood was successful in getting the property turned over to him for sale. The landowner knew nothing about the set-up between Roquemore and Greenwood. With Greenwood purporting to act as agent for the landowner, while he was in fact working for Roquemore's interest, he negotiated the price of the property down to $127,660.00, although Roquemore was willing to pay more.[1] Roquemore then discussed the matter further with Ford, and learned that its men in the lower echelon of the real estate division were inclined to favor the property if the zoning restrictions and the purchase price were satisfactory. Roquemore thereupon submitted to Ford a leather bound brochure dated May 12, 1964, analyzing the property's location in the Fort Worth business community, praising its potential as a truck sales and service center, and concluding that:

"1—The primary objective is to locate a suitable Truck Sales and Service Site for FORD Division.

"2—If the site as submitted meets specifications it is then essential that said site be placed under control via the option route. Since it is desirable not to reveal FORD MOTOR COMPANY as the ultimate principal or sponsor, I am prepared to be the optionee solely for the benefit of your Company.

"3—To execute an option with the owner requires that a deposit of approximately $2,500.00 be made with the granting by owner to optionee of 60 to 90 days to accomplish certain zoning and permit approvals and close the transaction.

\* \* \* \* \* \*

"5—You will observe that my reference to land cost was 'on a basis not to exceed .50¢ per square foot'. My efforts as negotiator will be to effect a land cost at the lowest possible figure *but not to exceed the above figure.*"

The italics in the above quotation appear in the brochure itself. The Court considers that at least equal emphasis ought to be given to the immediately preceding words, "My efforts as negotiator will be to effect a land cost at the lowest possible figure \* \* \*", as well as to the language in the concluding sentence of paragraph 2 reading, "I am prepared to be optionee solely for the benefit of your Company."

Ford informed Roquemore that the site had been preliminarily approved as

---

1. The following is quoted from Roquemore's own testimony:

"Q Was he (Greenwood) the agent in the deal for the owner as well as for you?

"A He was agent for Mr. Priddy, the owner of the property."

\* \* \* \* \*

"Q (By Mr. McElroy) Then what was Greenwood to do? Was he to negotiate the price down, or what was he to do?

"A He was to negotiate for me, speaking for American Standard Investment and/or W. H. Roquemore, and the price we could negotiate for the property on the direct purchase from Mr. Priddy.

"Q *He was to do that for you, to get the price down even though he was to be the agent for the Owner Priddy and Priddy was to pay him the commission?*

"A *That is right.*

"Q And did he then negotiate the price down, with Priddy?

"A He negotiated it to the figure that the contract states." (Emphasis added).

to location and physical characteristics, and to proceed to place the property under an option agreement.

Roquemore thereupon negotiated a written contract dated May 27, 1964, for the purchase of the property for $127,660.00. The named purchaser was American Standard Investment Company, a holding corporation owned by Roquemore. The then zoning restrictions on the land would not permit its use as a truck sales and service center, and the contract was conditioned upon the purchaser's ability to get the zoning changed to light industrial, at its expense, within ninety days. The contract provided for only $1,000.00 earnest money, but it was to be kept by the seller in the event the zoning change was denied. It was also stipulated that the contract could be assigned by the purchaser to "a nominee or assignee" prior to or at the time of closing; and it was assigned to Roquemore personally before he entered into option agreements with Ford.

On June 19, 1964, he wrote Ford that the site could be made available to them for $247,660.00, which figured between forty-five and forty-six cents a square foot. To support that price, he enclosed an informal appraisal letter from H. C. Nowlin, a reputable Fort Worth realtor, giving the opinion that the land was worth from $270,000.00 to $275,000.00. Roquemore also transmitted to Ford at that time a photocopy of the contract of May 27, 1964, for the purchase of the property by his corporation.

Roquemore led Ford to believe that Nowlin's appraisal dealt with the property in its vacant state. The facts were that he told Nowlin about the large buildings and extensive improvements Ford intended to put on the property, and asked him to give his informal opinion as to value based on what the property would be worth with such improvements on it. The photocopy of the contract of May 27, 1964, did not disclose the amounts of the purchase price or of the earnest money. Roquemore had taken

care of that by having an opaque covering put over the provisions in the original contract dealing with those matters when the photocopy was made. He never did divulge those true figures to Ford. Even though the contract of sale Roquemore and Greenwood had negotiated provided for only $1,000.00 earnest money, Roquemore told Ford that $5,000.00 earnest money would be required. He received $5,000.00 for that purpose when the first option agreement was made a few days later.

On June 22, 1964, a written option contract was executed between Roquemore and Ford, giving Ford the option to buy the property at $247,660.00. The contract gave Ford three days after the necessary rezoning had been accomplished to exercise its option. It also provided for $5,000.00 earnest money. Roquemore had appropriated the $5,000.00 as his property at the time of the trial.

The second option agreement was entered into on June 26, 1964. Its terms were similar to those of the first option except that it covered only 6.372 acres out of the entire tract at a price of $142,660.00. Ford requested the option on the smaller plot because it anticipated that its plan for dealer financing with private capital on the entire site might be difficult on account of the large purchase price required.

A hearing on the request for the zoning adjustment was held before the City Plan Commission of Fort Worth on July 21, 1964, and the City Council gave its approval of the necessary change on September 14, 1964. During the latter part of August, Ford had ordered a title binder from a title insurance company, soil tests of the site and an independent appraisal as time for final decision on purchase of the property approached. Through mistake, the title company issued its policy in the amount of $127,660.00 instead of $247,660.00. Inquiry developed that it had taken the amount from the contract of May 27, 1964, instead of the option contract. That was the first time that Ford knew that

Roquemore had submitted the property to them at almost double the price for which it was available, instead of at the "lowest possible figure", as he agreed in his brochure of May 12, 1964. The independent appraisal by H. S. Miller showed the value of the land to be only $145,000.00. H. C. Nowlin testified on the trial of the case that the site was worth about that amount without the proposed improvements on it, and the Court finds that $145,000.00 represented the value at the time Roquemore told Ford it was worth around $270,000.00.

When Ford learned the value of the land and the true facts of Roquemore's conduct in the negotiations, it advised him that it would not exercise either of its options. That decision was made just before the zoning adjustment was approved and was repeated when Ford was informed of the adjustment. Ford never changed that position. The purchase never at any time received final approval of Ford.

At all times prior to Ford's discovering the full terms of the May 27, 1964 contract, Ford believed from Roquemore's representations that he was serving as Ford's negotiator in the transaction; that he was trying to effect the purchase of the land at the lowest possible cost to Ford; and that he was looking after Ford's interest in serving as front man in the transaction. Roquemore did not seek to effect a land cost at the lowest possible figure to Ford, nor did he devote his efforts to serve as a negotiator in Ford's best interest. Roquemore did not seek to protect the interests of Ford in the transaction. While he purported to act as Ford's agent, he instead purchased the site in question in his own name and sought to re-sell same to Ford in a manner calculated to make him an undisclosed and outrageous profit.

Roquemore found another purchaser for the property at $152,500.00. He had had to give the landowner $135,000.00 to get an extension of time; but he came out of the transaction with a profit of

$17,500.00, plus the $5,000.00 he had received from Ford at the time of the execution of the option contracts. The fact that Roquemore sold the property on the open market for $152,500.00, after it had been rezoned, is a good answer to his argument that the jump from $127,600.00 to the $247,660.00 in his dealings with Ford was justified by the zoning adjustment.

The several independent grounds requiring a judgment for the defendant will be discussed under the headings that follow.

*Breach of Fiduciary Relationship*

■ Under the facts found by the Court, Roquemore was agent and fiduciary for Ford in the negotiations for the purchase of the property. Each of the following acts by him was a breach of his fiduciary duty owing to Ford which not only bars his claim but entitles Ford to recover the $5,000.00 it advanced to him as earnest money:

1. He concealed the amount of the purchase price asked by the owner.

2. He misled Ford about the true amount of earnest money necessary to tie up the property.

3. He misled Ford about Nowlin's appraisal.

4. He did not negotiate for the purchase of the land by Ford "at the lowest possible figure", as he agreed.

■ In Texas, a real estate broker engaged by a prospective buyer to negotiate for the purchase of land is an agent and a fiduciary for such buyer. Siegrist v. O'Donnell, Tex.Civ.App., 182 S.W.2d 403 (1944), err. ref.; Edwards v. Strong, 147 Tex. 155, 213 S.W.2d 979 (1948). The following is quoted from the opinion in the Siegrist case, 182 S.W.2d at p. 405:

"The evidence conclusively shows that Siegrist not only agreed to act as agent for O'Donnell in the purchase of the Cook 80 acre tract, but he did in fact so act. He attempted to make a secret profit of $2000 off his unsuspecting principal who resides in a dis-

tant state. This the law will not permit him to do. If the agent makes a secret profit without the full knowledge of his principal he must disgorge."

The rule requiring fiduciaries to make full disclosure of all the material facts to their principals is discussed at length by the Supreme Court of Texas in Kinzbach Tool Co., Inc. v. Corbett-Wallace Corp., 138 Tex. 565, 160 S.W.2d 509 (1942), one of the leading cases on the question, where the Court said (160 S.W. 2d at p. 513):

"We are unable to agree that the facts of this case being it within any rule that would make Turner's act and conduct in this instance measure up to the rule of fair dealing and good faith towards Kinzbach, which the law required of him. *It is the duty of a fiduciary to deal openly, and to make full disclosure to the party with whom he stands in such relationship.* (Citing cases). *One occupying a fiduciary relationship to another must measure his conduct by high equitable standards, and not by the standards required in dealings between ordinary parties.* (Citing cases) Turner's position as a trusted employee of Kinzbach in the capacity already detailed, called on him to make full disclosure to his employer of all the facts and circumstances concerning his dealings with Corbett. Also, when he received instructions from Kinzbach to get a price from Corbett it was his duty as a fiduciary to inform his employer what the whipstock contract might be bought for. It was also his duty to make disclosure to his employer that he was getting a commission from Corbett." (Emphasis added).

■ To remove all temptation, the law requires the fiduciary to give up secret profits made by him in a transaction where he has breached his duty to his principal. Kinzbach Tool Co., Inc. v. Corbett-Wallace Corp., supra; Edwards v. Strong, supra; Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786,

788, 120 A.L.R. 720 (1938); Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377, 387 (1945). In the Kinzbach Tool Co. case, the Court said 160 S.W.2d at p. 514:

"It is beside the point for either Turner or Corbett to say that Kinzbach suffered no damages because it received full value for what it has paid and agreed to pay. A fiduciary cannot say to the one to whom he bears such a relationship: You have sustained no loss by my misconduct in receiving a commission from a party opposite to you, and therefore you are without remedy. It would be a dangerous precedent for us to say that unless some affirmative loss can be shown, the person who has violated his fiduciary relationship with another may hold on to any secret gain or benefit he may have thereby acquired. It is the law that in such instances if the fiduciary 'takes any gift, gratuity, or benefit in violation of his duty, or acquired any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received.' United States v. Carter, 217 U.S. 286, 30 S.Ct. 515, 530, 54 L.Ed. 769, 775, 19 Ann.Cas. 594. See also Ash v. A. B. Frank Co., Tex.Civ.App., 142 S.W. 42; Armstrong v. O'Brien, 83 Tex. 635, 19 S.W. 268."

■ Even in a case where an agent has an agreement from the buyer that he can make his compensation out of a "spread", as Roquemore claims here, the principal is still entitled to a full disclosure of the material facts and to be treated with the utmost fairness and good faith. The price the owner puts on his own property might have an important bearing on the prospective buyer's decision as to whether he would be getting value for his money if he paid the figure at which the property is submitted to him. He might be willing to pay the owner's asking price plus a reasonable compensation for his broker's service, and yet refuse to pay al-

most double what the owner thought the property was worth. He certainly has the right to know all the material facts within the knowledge of his agent when he makes his decision on whether to buy.

■ Roquemore is not entitled to keep the $5,000.00 he got Ford to put up as earnest money, when only $1,000.-00 was required. He led Ford to beleive that $5,000.00 was the amount the land-owner was asking, when he already had a contract providing for only $1,000.00. The earnest money provisions of the contracts provided that the money would not be returned to Ford if the deal failed through inability to get the zoning restrictions relaxed. That meant that, unknown to Ford, Roquemore had it set up where he was bound to make $4,000.-00 out of the deal, even if his principal did not get the property, while the land-owner would get only $1,000.00. It may be that Ford would have agreed to such an arrangement, but Roquemore had enough doubts about it to cause him to see that the $1,000.00 figure did not appear in the photocopy of the May 27, 1964, contract he sent to Ford. At any rate, Ford was entitled to make its own decision after a full and fair disclosure from its fiduciary.

### Ford Was Never Legally Obligated to Buy the Property

■■ The only contracts Ford ever made in connection with the proposed purchase of the property were the written option contracts. Even if there had been prior oral agreements, enforceable or unenforceable, they would have been superseded by such written contracts. Danciger Oil & Ref. Co. of Texas v. Powell, 137 Tex. 484, 154 S.W.2d 632, 635, 137 A.L.R. 408; Albers v. Schumacher Co., Tex.Civ.App., 314 S.W.2d 852, no writ history. The *Albers* case says at page 855 that this rule may be rebutted only by a showing that the prior oral agreement was omitted from the written contract by reason of fraud, accident or mistake. Fords' obligations to Roquemore must therefore be determined from the option contracts. They did

not require Ford to buy the property, as an option to do a thing does not create an obligation on the part of the optionee to do it.

"The word 'option' implies a right to act or not, as the optionee may choose ' * * * choice between two things, courses, or propositions * *, right, power, or liberty of choosing between alternatives * * *. *It has been said that it cannot be given the meaning of must or shall.'* 67 C.J.S. p. 511; Norwood v. Adams, Tex.Civ. App., 51 S.W.2d 625. 'Its very essence is to enable the grantee to exercise the right therein granted or not to exercise it as he may elect.' Hereford v. Tilson, Tex.Civ.App., 198 S.W. 2d 275, 278; Corsicana Petroleum Co. v. Owens, 110 Tex. 568, 222 S.W. 154." (Emphasis added). Idalou Cooperative Cotton Gin v. Gue, Tex.Civ.App., 317 S.W.2d 240, 244 (1958), err. ref., n.r.e.

■ When Ford promptly notified Roquemore that it had decided not to exercise its option under the written contracts to purchase the property, it ceased to be under any obligation to him.

### The Contract the Plaintiff Claims Was Made

The Court could have discussed this question first and have stopped with its finding and conclusion that Ford never made any agreement that Roquemore "would be compensated by the spread if he could buy the property at a price below what Ford approved." There was no way Roquemore could recover in the absence of such an agreement, because his entire cause of action was predicated upon it.

■ It was felt, however, that the Court should go into the several independent grounds supporting the judgment for the defendant, for the purpose of making it clear that the existence of such an agreement, as claimed by the plaintiff, would not entitle him to recover. This is important because, as it turned out, there was no credible evidence that there was any agreement of

any kind for Roquemore's compensation; and he claims that he should have been allowed to show that he handled a prior deal for Ford wherein his compensation came from a "spread". The only purpose for offering such evidence was to prove an implied agreement that he would be compensated in the same manner in the present transaction. If it is assumed that the evidence had been admitted and that the agreement claimed by Roquemore had been established, he still could not recover for each of the following reasons:

1. Such an agreement would not have justified the breaches of his fiduciary duties.

2. The subsequent written option agreements would control, and they imposed no obligation on Ford to buy the property.

3. Article 6573a, Sec. 28, Texas Civil Statutes, makes the claimed agreement uneforceable because it was not in writing. That statute says that no action shall be brought to recover compensation for services in connection with the purchase or sale of real estate "unless the promise or agreement upon which action shall be brought, or some memorandum thereof, shall be in writing and signed by the party sought to be charged therewith or by some person by him thereunder lawfully authorized." The following quotation from Taylor v. Sellers, Tex.Civ.App., 348 S.W.2d 99, 101, no writ history, shows the application that has been made of the statute by the courts of this State:

"In a similar situation the court, in Estes v. Dow, Tex.Civ.App., 290 S.W. 2d 561, 564, held: 'It is clear to us from plaintiff's deposition—the alternative allegation in the first amended petition to the contrary notwithstanding—that plaintiff's suit is actually solely one to recover compensation for services as a real estate dealer within the meaning of that term as defined in Art. 6573a. Plaintiff does not claim * * * to have any written contract covering his compensation. This being true, *it would be contrary to the Statute and to the declared public policy of the State to permit a recovery.* Gregory v. Roedenbeck, 141 Tex. 543, 174 S.W. 2d 585; Breeding v. Anderson, 152 Tex. 92, 254 S.W.2d 377.' " (Emphasis added).

4. Ford had to purchase the property before there could be any "spread" to compensate Roquemore. There was no written agreement obligating it to buy. An oral agreement to purchase the realty would have been un-enforceable under the Statute of Frauds of this State. Article 3995, subd. 4, Texas Civil Statutes; American National Insurance Company v. Warnock, Tex.Civ.App., 143 S.W.2d 624, 628 (1940); err. dis., c.j.; Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114, 15 A.L.R. 216 (1921); Robertson v. Melton, Tex.Com.App., 131 Tex. 325, 115 S.W.2d 624, 628, 118 A.L.R. 1505 (1938), opinion adopted by Supreme Court. Roquemore was therefore without any standing to claim an obligation on the part of Ford to take the property and create the "spread", whether he established his alleged agreement or not.

This opinion will serve as findings of fact and conclusions of law, as provided in Rule 52(a), F.R.Civ.P., and judgment will be entered for the defendant as indicated.