**W. H. ROQUEMORE, Appellant,**

v.

**FORD MOTOR COMPANY, Appellee.**

**No. 25322**

United States Court of Appeals
Fifth Circuit.

Sept. 3, 1968.

Rehearing Denied Oct. 4, 1968.

Wm. Andress, Jr., Dallas, Tex., for appellant.

B. Thomas McElroy, Dallas, Tex., for appellee.

Before RIVES, BELL and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

In this diversity action we must determine whether a breach of fiduciary duty by a local real estate agent is excused because it was directed, with moderate success, against Ford Motor Company. Concluding as we do that even corporate colossi should not be targets of fraud, we affirm the award of the district court.

The following condensation of material facts is uncontested. About May 1, 1964, representatives of Ford Motor Company contacted Wendell Holmes Roquemore, a

real estate agent licensed under the laws of Texas, regarding the purchase of land in Fort Worth, Texas. Ford wished to acquire a site for a truck sales and service center in Fort Worth and desired to have Roquemore act as a "dummy" or "front man" in order to prevent public disclosure of Ford's interest. During one of the meetings that followed, Ford's district sales manager in Dallas, Ken Stoepel, informed Roquemore that a vacant tract owned by H. T. Priddy was available for sale. Stoepel disclosed to Roquemore that Ford would pay no more than 50 cents per square foot for the property, approximately $270,000. Roquemore, upon learning the identity of the seller's real estate agent, assured Stoepel that because this agent owed him a favor he would be able to negotiate a good price.

At Stoepel's request to lay out the proposed transaction for the home office, Roquemore submitted to Ford a leather-bound brochure dated May 12, 1964, which analyzed the property's location in the Fort Worth business community and praised its potential as a truck sales and service center. The final page in the brochure was composed of seven "Conclu-clusions," the most relevant of which we quote below:

"1—The primary objective is to locate a suitable Truck Sales and Service Site for FORD division.

2—* * * Since it is desirable not to reveal FORD MOTOR COM-PANY as the ultimate principal or sponsor, *I am prepared to be the optionee solely for the benefit of your Company.* [Emphasis added.]

* * * * * *

5—You will observe that my reference to land cost was 'on a basis not to exceed .50¢ per square foot.' My efforts as negotiator will be to effect a land cost *at the lowest possible figure* but *not to exceed the above figure."* [Emphasis in original as to only the last six words.]

Both Stoepel and Herbert Q. French, a truck dealer operations manager at Ford's headquarters in Dearborn, Michigan, read the brochure and gave approval for Roquemore to place the property under option. (Whether Stoepel later instructed Roquemore to "tie the property up any way he could," as is claimed by Roquemore, is a contested fact which we find lacking in material significance.) Roquemore thereupon negotiated a written contract dated May 27, 1964, for the purchase of the property for $127,660.00, a figure far below Ford's estimate at 50¢ per square foot.[1] The purchase was made subject to the Fort Worth City Council's re-zoning the property for "light industrial" use.

Roquemore immediately advised Stoepel that the property was "tied up." On June 19, 1964, he wrote a letter to Ford's Dallas district sales office advising them, in part: "I can now confirm the negotiated sale price of this 12.372 acre tract to be $247,660.00." We find the entire letter to be relevant to the issues at bar and therefore quote it in full:

"Gentlemen:

In the proposal which I submitted to you on May 12th, 1964 reference was

A. He was to negotiate for me, speaking for American Standard Investment [Roquemore's personal holding company] and/or W. H. Roquemore, and the price we could negotiate for the property on the direct purchase from Mr. Priddy.

Q. He was going that [sic] for you, to get the price down even though he was to be the agent for the owner Priddy and Priddy was to pay him the commission?

A. That is right."

1. Part of Roquemore's success in buying at such a low price can perhaps be attributed to the fact that the seller's representative in the transaction not only was a friend who owed him a favor, as Roquemore had indicated to Stoepel, but also was licensed not as a real estate broker but rather as a real estate salesman *under Roquemore.* We note Roquemore's admission during cross examination of this agent's conflicting interests:

"Q. And what was Mr. Greenwood [the agent] to do?

made to land cost of the subject Fort Worth property as 'on a basis not to exceed .50¢ per square foot.' In my opinion this is a reasonable and fair valuation.

At your request I have secured another appraisal of this land from a competent and unprejudiced source, the original of which I herewith enclose. I call your attention to his fair market value figures of 'from $270,-000.00 to $275,000.00.'

Mr. H. C. Nowlin is a man of high standing, as well as long experience, in Fort Worth real estate dealings. His judgment of Commercial and Industrial land values in the Fort Worth area is second to none.

I can now confirm the negotiated sale price of this 12.372 acre tract to be $247,660.00. At this figure the square foot price is between .45¢ and .46¢.

With respect to the factor of change in zoning, the formal application will be filed before Friday, June 26th. All adjoining property owners have been talked to and have agreed to join us in our re-zoning petition. It is reasonably assumed that the Forth Worth Zoning Board will look with favor on our request.

Yours very truly,

W. H. ROQUEMORE"

Nowlin had indeed appraised the value of the land to be "from $270,000 to $275,-000." However, Nowlin testified at trial that his appraisal was based, not on the value of the land as it was, but rather "on what he [Roquemore] told me of what he hoped would be built on it."[2]

2. The above testimony precipitated a diversionary cross examination by Roquemore's counsel, after which the following dialogue occurred between Nowlin and Judge Brewster:
"The Court. Just a minute. I am not sure I understand this. You said when you fixed this or made this appraisal—did you make it on the property as bare land, or what it would be worth with no improvements?

On June 22 Roquemore furnished Stoepel a copy of the purchase contract with Priddy (the purchaser being Roquemore's personal holding company) with the amount of earnest money and the total consideration deleted therefrom. He also presented to Stoepel an option contract providing that in consideration of $5,000 cash Stoepel or his assigns would be granted an option to purchase the property for $247,660, which option would be subject to a re-zoning of the property to "light industrial" use. Stoepel signed the contract as purchaser pursuant to his authorization from Ford.

Before a re-zoning of the property had been approved by the Fort Worth City Council, Ford's real estate division received information concerning Roquemore's purchase price from Priddy. Upon confirming this information a representative of the real estate division called Roquemore advising him that Ford would not purchase the property. The City Council approved re-zoning of the property a few days thereafter, and Roquemore, who could not have paid the purchase price to Priddy, was forced to find another purchaser. He did so and concluded all transactions with a profit of $17,500 plus the $5,000 advance payment which he had received from Ford.

On April 23, 1965, Roquemore filed suit against Ford in a state district court for recovery of the difference between the unpaid contract price with Ford and his final profit, a sum of $102,500. Ford removed the case to the federal district court and filed a counterclaim for return of its $5,000 option payment to Roquemore.

A. No, what I intended—I had known what the purpose was and I didn't ask but I would have, but I didn't. I presumed he was representing Ford at the time he told me, in so many words, he did, and I presumed—I intended this to be as to improvements.
The Court. If it had those improvements on it, that would be the value of the land?
A. Yes, that's right."

The district court filed a pre-trial order on November 5, 1965, which in addition to summarizing the opposing arguments and issues acknowledged the following admissions by Roquemore:

"Plaintiff agrees that if the true agreement was only an option to Ford, then Ford never exercised the option; and that if Roquemore was obligated to make the lowest possible price to Ford, and to disclose Priddy's sale price, he did not do so."

This order, including the above admissions, was signed as "Approved" by counsel for both Roquemore and Ford.

In a thorough Memorandum Opinion and Judgment filed May 30, 1967, 290 F.Supp. 130, the district court denied Roquemore's claim and awarded to Ford its $5,000 counterclaim in full. The court expressly found that Ford had signed no agreement other than the option agreement mentioned previously.[3] The court also held that, under the Texas Real Estate License Act, Article 6573a, Section 28,[4] any oral agreement for consideration to Roquemore would be unenforceable. Since, as Roquemore had admitted and as the court found, the option was never exercised, the court disallowed Roquemore's claim in full. Finally, the court found that Roquemore had breached his fiduciary relationship with Ford and granted Ford's counterclaim of $5,000.

The district court's judgment, as it relates to Roquemore's original action against Ford, is clearly supported by both fact and law and can be affirmed without further extensive discussion. See Reeder v. Osborne, Tex.Civ.App. 1965, 393 S.W.2d 833; Struller v. McGree, Tex.Civ.App.1963, 374 S.W.2d 256, error ref., n. r. e.; Walker v. Keeling, Tex.Civ.App.1942, 160 S.W.2d 310;

Landis v. Fuqua, Inc., Tex.Civ.App.1942, 159 S.W.2d 228, which relate to established Texas law that a real estate agent cannot recover in contract or in quantum meruit unless compensation has been agreed to in writing.

Affirmance of the $5,000 judgment to Ford is likewise demanded under the facts of this case and the Texas law. Of Roquemore's twenty-one points of error on appeal, at least fourteen concern either the district court's findings of fact or the court's admission of certain evidence. We have ferreted the record for reversible error and have found not a trace.

In the remaining points of error, Roquemore tries to dissipate his fiduciary relationship with Ford through essentially two arguments. First, he contends that he cannot be Ford's agent because the option contract fails to provide for his compensation and because the district court found that contract to be the only evidence of contractual relationship between Ford and Roquemore. Without an agency relationship, he continues, he could deal with Ford as an arms-length seller of property. Second, Roquemore argues that even if he did occupy a fiduciary relationship with Ford at the outset, his offer of sale to Ford and the execution of the option contract converted the relationship to one of arms-length seller and purchaser.

Roquemore's contentions have been expressly answered by the Texas Supreme Court in Schiller v. Elick, 1951, 150 Tex. 363, 240 S.W.2d 997. In that case the defendant Elick, a bank employee, had obtained a buyer for the plaintiff's farm and had aided the parties in consummating the transaction. Elick, however, had constructed the transaction so that the plaintiff and her husband con-

---

3. Actually there were two option agreements, one covering the entire tract and one covering only part of the tract. For purposes of the issues at bar, however, they may be considered as one.

4. "Sec. 28. No action shall be brought in any court in this State for the recovery of any commission for the sale or purchase of real estate unless the promise or agreement upon which action shall be brought, or some memorandum thereof, shall be in writing and signed by the party to be charged therewith or by some person by him thereunder lawfully authorized."

veyed their entire interest to him, whereupon immediately, and at the same price, he reconveyed the land to the ultimate purchaser, reserving a ¼ non-participating mineral interest for himself. The plaintiff sued to impose a constructive trust on Elick's interest, which was granted by the district court. The Court of Civil Appeals reversed; however, the Supreme Court reversed the judgment of the Court of Civil Appeals and affirmed that of the district court.

The Court in Schiller v. Elick spoke clearly and forcefully on the very issues before us at bar. On the essentials of a fiduciary relationship the Court stated:

"Under Elick's own testimony he undertook initially to get buyer and seller together and bring about a sale of the property. Usually this is the main function of an agent in a real-estate transaction. The term 'fiduciary' as used in the Texas cases has not been reduced to precise definition. Edwards v. Strong, 147 Tex. 155, 213 S.W.2d 979. The cases all involve an overreaching made possible by a misplaced confidence. *It is not necessary for there to be all of the elements of agency for hire for a 'fiduciary relationship' to come into being.* See Fitz-Gerald v. Hull, [150 Tex. 39], 237 S.W.2d 256, for an exhaustive discussion of the term 'fiduciary.' See also Judge Speer's discussion in Peckham v. Johnson, Tex.Civ.App., 98 S.W.2d 408, affirmed in part in, 132 Tex. 148, 120 S.W.2d 786, 120 A.L.R. 720." 240 S.W.2d at 999–1000. [Emphasis added.]

The Court spoke even more specifically as to necessity of compensation in the establishment of fiduciary relationship:

"The Court of Civil Appeals has held that there was either an agency agreement between the Schillers and Elick or a sales agreement but not both, and that one must negative or exclude the other. Reasoning from this, they hold that, since the sales contract was written, any proof to establish a prior fiduciary relationship would alter the terms of the sales contract and for that reason be controlled by the Parol evidence rule. The fallacy lies in the first premise, because, under this record, *the trial court could find a fiduciary relationship (not necessarily agency for compensation) established before the sales contract and deed* followed by a sale by the principal to his fiduciary. Equity examines such sales very closely. Shannon v. Marmaduke, 14 Tex. 217; Connolly v. Hammond, 51 Tex. 635; Nabours v. McCord, 97 Tex. 526, 80 S.W. 595; Allison v. Harrison, 137 Tex. 582, 156 S.W.2d 137." 240 S.W.2d at 1000. [Emphasis added.]

Concerning the defendant Elick's contention that the sales contract as a matter of law established a vendor-vendee relationship and negated any fiduciary relationship, the Court answered:

"Such a holding would prohibit Equity from ever examining a deed between a fiduciary and his principal. It has been long established that a court of equity has a right to examine transactions between a fiduciary and his principal, Gaston & Thomas v. Dashiell, 55 Tex. 508, and set aside a deed resulting from a breach of duty by a fiduciary. Binford v. Snyder, 144 Tex. 134, 189 S.W.2d 471. Here the operative clauses of the sales contract and deed created the relationship of vendor and purchaser *as of the very time* they were executed. They do not, therefore, negative or contradict the existence of a prior fiduciary relationship. The converse of this is that proof of the prior fiduciary relationship does not contradict or vary the terms of the sales contract and deed." 240 S.W.2d at 1000 [Emphasis in original.]

The Court also clearly categorized the controlling issues before it as being essentially factual:

"Elick offers considerable proof supporting his contention that this was in fact an arm's length trade, and argues it effectively here. Our problem is not to determine who is telling the truth, but only to determine whether

there is any testimony which, if believed, will support the trial court's judgment. *Whether or not a fiduciary relationship exists is a question of fact.* MacDonald v. Follett, 142 Tex. 616, 180 S.W.2d 334." 240 S.W.2d at 999. [Emphasis added.]

Finally, the Court unequivocally espoused the need for equitable protection in real estate transactions:

"It might be argued that this holding imposes a higher standard of business ethics upon the parties to a real-estate transaction than the law has a right to expect. The growth of the law has been consistently towards higher ethical standards. Shannon v. Marmaduke, supra; Johnson v. Peckham, supra; MacDonald v. Follett, supra. Extending the term 'fiduciary' beyond formal relationships (as, for example, guardian and ward) widens the possibility of attack by perjury upon legal instruments, but this has been determined as not controlling in Fitz-Gerald v. Hull, supra, and cases there cited." 240 S. W.2d at 1001.

For our Court's acceptance of many of the above principles, see Johnston v. Goggin, 5 Cir. 1963, 323 F.2d 36, affirming Goggin v. Moss, N.D.Tex.1962, 221 F. Supp. 905. See also Section 16 of Article 6573a, which makes certain acts or omissions of a real estate broker or salesman unlawful, subjecting said broker or salesman to suspension or revocation of his license.[5]

Roquemore's only possible escape from the teachings of Schiller v. Elick is in the contrast in equity claimants between Ford Motor Company at bar and Mrs. Schiller, an elderly widow of German origin who had worked on the family farm for twenty-five years before the sale to Elick. To be sure, the difference in fraud susceptibility may certainly have been a factor for consideration of the trier of facts. But we cannot say that the district court's factual conclusions, based on the undisputed facts listed above and on additional testimonial buttresses, were clearly erroneous.

The invulnerability of the large corporation, moreover, may be more myth than reality. Large corporations often have myriad and labyrinthian lines of communication with multiple, intersecting chains of authority. It is easy for such corporations to know and not to know simultaneously and perhaps to be even more subject to the wiles of commercial immorality than small enterprises and entrepreneurs.

Fiduciaries are not the products of statutory codification; they can arise out of the moral code of the market place. Roquemore was the confidant of Ford. He was the one Ford chose to seek properties, and he cannot place integrity and candor beyond the pale of that commission and transmute himself into an arms-length owner of property. He was selected not as a seller but as a negotiator for Ford. This relationship imposed duties upon him which perhaps are not found in tablets of stone but exist because the law demands that in some relationships man must be able to trust his fellow man.

Affirmed.

---

5. The relevant prohibitions of that section are as follows:

(1) Knowingly making a substantial misrepresentation; or

(2) Making any false promise with intent to influence, persuade or induce; or

(3) Pursuing a continued and flagrant course of misrepresentation or the making of false promises through agents, salesmen, advertising, or otherwise; or

(4) Failure to make clear to all parties to a transaction for which party he is acting, or receiving compensation from more than one party, except with the full knowledge and consent of all parties; or

\*     \*     \*     \*     \*

(10) Acting in the dual capacity of broker and undisclosed principal in any transaction; or

\*     \*     \*     \*     \*

(22) Conduct which constitutes dishonest dealings, bad faith, untrustworthiness or incompetency.