**LEHIGH VALLEY TRUST COMPANY,**
Plaintiff-Appellee,

v.

**CENTRAL NATIONAL BANK OF JACK-SONVILLE,** Defendant-Appellant.

No. 26444.

United States Court of Appeals
Fifth Circuit.

April 3, 1969.

John E. Mathews, Jr., James E. Cobb, Norman P. Freedman, Jacksonville, Fla., for appellant; Mathews, Osborne & Ehrlich, Jacksonville, Fla., of counsel.

C. Harris Dittmar, Charles P. Pillans, Jacksonville, Fla., Dechert, Price &

Rhoads, Philadelphia, Pa., for appellee; Bedell, Bedell, Dittmar & Smith, Jacksonville, Fla., of counsel.

Before JOHN R. BROWN, Chief Judge, and GEWIN and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

This is another securities fraud case brought under Rule 10b–5 of the Securities and Exchange Commission. The appellant, Central National Bank of Jacksonville (Central Bank) sold to the appellee, Lehigh Valley Trust Company (Lehigh Trust), a participation interest in a loan originated by Central Bank. When this loan became uncollectible, Lehigh Trust sued Central Bank for damages on the grounds that Central Bank, in selling the loan participation, had failed to make a full and truthful disclosure of all material facts relevant to the participation, in violation of the Securities Exchange Act of 1934 [1] and Rule 10b–5 promulgated thereunder.[2] Lehigh Trust also predicated its claim for damages upon the common law of Florida.

This case was submitted to a jury which returned a general verdict on facts which would justify the jury's finding that there were misstatements of material facts pertinent to the negotiations regarding Lehigh Trust's purchase of the loan participation. Judgment in the amount of $106,341.00 was entered for Lehigh Trust under both Rule 10b–5 and Florida law. On appeal Central Bank argues that the judgment of the court below is erroneous because: (1) a loan participation agreement is not a security; (2) the fraud provisions of the Securities Exchange Act of 1934 do not apply to transactions between banks; and (3) that the omitted and misstated facts were not material. We find these specifications of error to be without merit and affirm.

## I.

In 1963 the Larso Development Company attempted to negotiate a loan of $325,000.00 from Central Bank. Central Bank was able to lend only $185,000.00 to Larso Development, but it did agree to help raise the needed capital by selling participation interests in a $325,000.00 loan. Through an intermediary, Lehigh Trust learned of and became interested in the loan participation.

In order to determine whether it should buy a participation in the loan, Lehigh Trust contacted Central Bank to learn about Larso Development and the individuals personally guaranteeing the Larso Development note. Lehigh Trust was informed that the company was sound and that the note was secured by 423,000 shares of stock in Intercontinental Motels, Ltd., a corporation whose shares were "worth $2 to $2.50" each.

The guarantors were described as "high type individuals," "outstanding lawyers," and "outstanding citizens." Central Bank stated that Martin Von Zamft, the prime personal guarantor of the note and also the power behind both Larso Development and Intercontinental Motels, was a "good customer of our bank, had been for a long time and * * was all right." Central Bank, however, failed to mention that it had had difficulty in collecting on several of its loans to Von Zamft, and that the bank examiners had criticized the security for some of these loans. Moreover, it neglected to disclose that certain other banks had recently foreclosed on collateral securing loans made to other Von Zamft corporations, which collateral also secured loans then outstanding to Central Bank, and that Von Zamft had advised Central Bank that he had "had an extremely bad year and had suffered a large decrease in net worth."

In fact, Von Zamft's year had been so bad that his financial empire was on the verge of collapse. The financial condition of Intercontinental Motels, the Von Zamft enterprise whose stock was the primary security for the $325,000.00 Larso Development loan, had deteriorated to the point where proceedings were

---

1. 15 U.S.C.A. § 78a et seq. (1963).

2. 17 C.F.R. § 240.10b–5 (1968).

instituted by other creditors to reorganize Intercontinental under Chapter X of the Bankruptcy Act. Larso Development followed in the downward financial footsteps of Intercontinental, and was unable to make the loan payment due May 1, 1965. When the loan proved uncollectible, Lehigh Trust was left with a loss of $106,341.00. This suit followed.

In the court below Lehigh Trust showed that Central Bank initially made poorly secured loans to Von Zamft, the financial wizard behind all of the above corporations, and then tried to "bail out" these bad loans by making new loans to new Von Zamft corporations. Throughout this history of bad loans, "the only way Central Bank could hope to keep from suffering a large loss on loans which it made to Von Zamft and his associates was to keep Von Zamft afloat by making new loans to new borrowers and on new securities as they were produced by Von Zamft to replace old borrowers and old securities which had gone sour." The extent of the bailouts escalated to the point where 10% of the bank's assets were committed to Von Zamft enterprises. Because under the state banking law no more money could be lent to this one customer, Central Bank had to attempt the ultimate bailout—the sale of participations in the Larso Development loan to Lehigh Trust and other financial institutions.

Upon this record the jury found that Central Bank had misled Lehigh Trust in regard to the Larso Development loan by omissions and misstatements of material facts relevant to Lehigh Trust's purchase of the participation in the loan. Judgment in the amount of $106,341.00 was entered for Lehigh Trust under both Rule 10b–5 and the state cause of action.

## II.

Central Bank, the appellant, contends that its conduct relating to the loan participation agreement with Lehigh Trust was not in violation of Rule 10b–5 of the Securities and Exchange Commission, which provides as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5 (1968).

In particular, Central Bank argues that Rule 10b–5 is not applicable here because a loan participation agreement is not a security as that term is used in the rule. Moreover, argues Central Bank, any misstatements or omissions of which it is guilty were not of *material* facts.

Central Bank recognizes that the definition of a security in the Securities Exchange Act of 1934 expressly includes "any note" and that the Larso Development note falls within this definition. The Act provides that "the term 'security' means any note * * * or any certificate of interest or participation in * * * any of the foregoing." 15 U.S.C.A. § 78c(a) (10).[3] Moreover, this def-

---

3. The full text of 15 U.S.C.A. § 78c(a) (10) (1963) reads as follows:

"(a) When used in this chapter, unless the context otherwise requires—

*(10) *The term 'security' means any note*, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or *any certificate of interest or participa-*

inition of a security has been literally read by the judiciary to the extent that almost all notes are held to be securities. Llanos v. United States, 9 Cir. 1953, 206 F.2d 852, cert. denied, 1954, 346 U.S. 923, 74 S.Ct. 310, 98 L.Ed. 417; Prentice v. Hsu, S.D.N.Y.1968, 280 F.Supp. 384, 386; Olympic Capital Corp. v. Newman, C.D.Cal.1967, 276 F.Supp. 646, 653; Whitlow & Associates, Ltd. v. Intermountain Brokers, Inc., D.Hawaii 1966, 252 F.Supp. 943, 947–948; S. E. C. v. Gulf Intercontinental F. Corp., S.D.Fla. 1963, 223 F.Supp. 987, 994; S. E. C. v. Addison, N.D.Tex.1961, 194 F.Supp. 709, 721; Bromberg, Fraud: SEC Rule 10b– 5 § 4.6 (1968); contra, Beury v. Beury, S.D.W.Va.1954, 127 F.Supp. 786, 789.

■ Central Bank, however, is not charged with the sale of the Larso Development note, but rather with the sale of the loan participation. This agreement also is clearly within the statutory definition of a security as that definition includes *"any certificate of interest or participation in * * * any of the foregoing [note, stock, etc.]."* We have found no case dealing with this particular language; but in view of the Supreme Court's policy of giving a broad reading to the definition of a security, Tcherepnin v. Knight, 1967, 389 U.S. 332, 338, 88 S.Ct. 548, 554, 19 L.Ed.2d 564, 570, and its generally expansive construction of the anti-fraud provisions of the Securities Exchange Act, S. E. C. v. National Securities, Inc., 1969, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668, we must read the statute literally so as to include the participation agreement between Central Bank and Lehigh Trust within the security category.

■ Central Bank attempts to circumvent the *clear and commanding* statutory language with the policy argument that the Securities Exchange Act was intended only "to provide protection for innocent, uninformed investors in connection with the buying and selling of securities from well-informed, knowledgeable investment institutions." It argues that since both the purchaser and the seller of the participation agreement were banks with considerable investment expertise and were dealing at armslength, the purchaser should not be accorded the protection given to an unsophisticated investor. In short, Central Bank argues that this Court should hold that the Securities Exchange Act is not applicable to financial transactions between banks. *cf.* First Trust & Savings Bank of Zanesville, Ohio v. Fidelity-Philadelphia Trust Co., 3 Cir. 1954, 214 F.2d 320, 50 A.L.R.2d 1218, cert. denied, 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 674.

■ This policy argument has neither statutory nor case authority, and it also lacks theoretical merit. Neither Congress nor the Securities and Exchange Commission has indicated that the unsophisticated and the unwary are the only wards of Rule 10b–5. Fraud may also be perpetrated upon the powerful and the sophisticated. *cf.* Roquemore v. Ford Motor Co., 5 Cir. 1968, 400 F.2d 255. Therefore, in view of the fact that gullibility is not the province of any one group, the protections and remedies of the Securities Act are not accorded only to those who fail a battery of information and intelligence tests, but are simply conditioned upon the misrepresentation of material facts.

■ Likewise, the Act makes no general exception for transactions between financial institutions, and no case has been found which reads such an exception into the statutory framework. Moreover, the fact that Congress exempted from the registration requirements of the Securities Act of 1933 the securities of any "banking institution * * *

---

*tion in*, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, *any of the foregoing;* but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which

has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." [Emphasis added.]

the business of which is substantially confined to banking and is supervised by the State * * * banking commission * * * " 15 U.S.C.A. § 77c(a) (2), indicates that Congress was aware of the peculiar problems and strengths of banks resulting from their regulation by state and federal banking statutes. That Congress made no express general exemption for banks under the fraud provisions of either the Securities Act of 1933 or the Securities Exchange Act of 1934 indicates that Congress did not intend any such exemption.

Furthermore, the facts of this case show the wisdom of not excepting banks from the protections and restrictions of § 10b–5. Although Lehigh Trust was experienced in the intricacies of loan participation agreements, it still had to rely upon the representations of Central Bank to determine the soundness of the transaction. Lehigh Trust, being located in a small Pennsylvania town, had no way to independently verify the information supplied by Central Bank which was on intimate terms with the borrower; consequently it had to rely upon the truth of the recommendations of Central Bank. Thus the application of Rule 10b–5 in this case furthers rather than frustrates the Congressional policy "to protect interstate commerce, the national credit, * * * to protect and make more effective the national banking system and Federal Reserve System, and to insure the maintenance of fair and honest markets in such transactions." 15 U.S.C.A. § 78b.

■ Though Central Bank also argues that it made no misrepresentations of material facts, it clearly failed to inform Lehigh Trust of several facts and misinformed it as to others. Thus the question is whether the subject facts were material in the sense that a reasonable man would attach importance to them in determining his choice of action in the transaction in question. S. E. C. v. Texas Gulf Sulphur Co., 2 Cir. 1968, 401 F.2d 833, 849. See also Heit v. Weitzen, 2 Cir. 1968, 402 F.2d 909, 913; Bromberg, supra, § 8.3; Bromberg, Corporate

Information: Texas Gulf Sulphur and Its Implications, 22 Sw.L.J. 731 (1968). In determining whether to make an investment in the participation loan, a reasonable man would attach great significance to the following facts which Central Bank either omitted or misstated: the true financial condition of Martin Von Zamft (the prime personal guarantor of the Larso Development note) and of his corporate dominion; the difficulty Central Bank had had in collecting on previous loans to Von Zamft; and the fact that the proceeds of the participation loan were to be used to "bail out" the earlier uncollectible loans to Von Zamft. Thus we conclude that there was substantial evidence in the record from which a jury could find that the omitted and misstated facts were material.

■ As this misleading information was dispensed "in connection with the purchase or sale" of the loan participation in interstate commerce, see Lawrence v. S. E. C., 1 Cir. 1968, 398 F.2d 276, 278, Central Bank violated Rule 10b–5. Lehigh Trust, having been damaged by that violation, has a cause of action to recover civil damages from Central Bank. Jordan Building Corp. v. Doyle, O'Conner & Co., 7 Cir. 1968, 401 F.2d 47. Since the evidence supports Lehigh Trust's allegations of fraud and materiality, the district court's judgment against Central Bank under Rule 10b–5 is affirmed.

### III.

■ The judgment against Central Bank was also based upon the common law of Florida. We agree with the district court that Central Bank's misstatements and omissions relative to the loan participation constituted actionable fraud under Florida law. In Forbes v. Auerbach, Fla.1952, 56 So.2d 895, 900, 32 A.L.R.2d 176, the Supreme Court of Florida held:

"The authorities hold that recovery may be had for misrepresentation as to a third party's financial condition where a person, for the purpose of in-

ducing another to *lend money* or sell goods or other chattels on credit to said third person by misrepresenting the financial responsibilities of such third person or by misrepresenting the solvency or financial responsibility of such third person." [Emphasis added.]

The commercial morality espoused by the Federal Securities Acts and their state complements is a salutary fact of business in the security market places of the twentieth century. This morality requires full and truthful disclosure of material information, even in transactions between sophisticated financial institutions.

Affirmed.