**CARROLL et al., Plaintiffs-Appellants,**

v.

**FIRST NATIONAL BANK OF LINCOLNWOOD, Defendant-Appellee.**

No. 17154.

United States Court of Appeals
Seventh Circuit.

June 27, 1969.

---

John J. Enright, Sidney R. Zatz, Arvey, Hodes & Mantynband, Chicago, Ill., for appellants.

David Ferber, Securities & Exchange Commission, Washington, D. C., Philip A. Loomis, Jr., General Counsel, Frank N. Fleischer, Atty., Securities and Exchange Commission, Washington, D. C., amici curiae.

William J. Harte, Martin S. Gerber, Chicago, Ill., for appellee.

Before DUFFY, Senior Circuit Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

The principal issue presented by this appeal is whether the amended complaint adequately states claims against the First National Bank of Lincolnwood, Illinois (the "Bank"), under Section 10(b), of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b–5 of the Securities and Exchange Commission (17 C.F.R. 240.10b–5). The district court dismissed this pleading with respect to the Bank for failure to state a claim upon which relief could be granted, while denying dismissal as to the individual defendants. Our conclusion is that the amended complaint is sufficient, so that the case must be remanded for trial of the claims against the Bank along with the other defendants.

In order to set out separately the particular securities transactions by which plaintiffs were allegedly defrauded, the amended complaint is in 50 Counts and runs some 88 printed pages in the appendix. The odd-numbered Counts are brought under Section 10(b) and Rule 10b–5, whereas the even-numbered Counts are based on common law fraud. The plaintiffs are Link, Gorham, Peck & Co. ("Link"), a Chicago securities dealer, and the three Chapter X bankruptcy trustees of Edward N. Siegler & Co. ("Siegler"), a Cleveland, Ohio, securities dealer having a branch office in Chicago.

The amended complaint charges that the Bank was a "main participant" in a scheme or conspiracy to defraud plaintiff securities dealers "in connection with the purchase and sale of securities" by means of materially false representations, untrue statements of material facts, and the making of misleading statements. Of the 23 individual defendants presently in the case, five were officers or directors of the Bank and two were employees of plaintiffs. All seven were described as main participants.

According to plaintiffs, the scheme originated in January 1966 and involved the purchase of large amounts of securities at different times for speculative purposes. The essence of the scheme was the creation of a "credit bubble" by causing plaintiffs to finance such purchases and, in the expectation of rising market values, "to obtain delay for the participants in payment and settlement of purchases of securities made through and from the plaintiffs so [that] the participants [could] hold speculative ownership positions in the securities purchased by use of plaintiffs' funds and resources." The complaint also alleges that purchases beyond the financial capacity of the participants were made for the purpose of manipulating the market price of the purchased securities, thus allowing the participants to unload the securities at inflated prices in order to pay for their original purchases.

The purchases were C.O.D., requiring full cash payment only upon delivery of the securities to the bank designated by the purchaser, in this case the defendant Bank. The amended complaint alleges that as the relevant settlement drafts were directed to the Bank, the Bank "received and held [each of] the drafts and accompanying securities, without paying the draft or returning it, for as long as possible." If the Bank were questioned about non-payment, the Bank, its officers and two defendant employees of the Bank "obtained additional time by making statements and giving assurances that arrangements for payment were unavoidably delayed or were in progress, and that payment would be forthcoming," even though these statements were untrue and misleading. Other purported

wrongdoing of the Bank, its officers and certain of its employees is detailed in the amended complaint.

Finally, the Bank, its chairman, its president, one of its vice presidents, and one of its assistant vice presidents are said to have assisted two of plaintiffs' employees, now defendants, in this scheme by arranging for persons other than the designated customers to pay the drafts and purchase the securities, without the knowledge of plaintiffs, in order to conceal the participants' inability to finance the purchase orders which they placed. It is alleged that the scheme collapsed in a declining market for the accumulated securities, resulting in an inability to prolong the shoestring purchases. In May 1966, the plaintiffs discovered that the Bank was holding a large number of uncollectible drafts drawn by plaintiffs and payable at the Bank for purchases of securities from plaintiffs on behalf of participants in the scheme. The uncollectibility of these drafts is said to have resulted in large losses to Link and the insolvency of Siegler.

The Bank's motion to dismiss the amended complaint asserted that it did not state a violation of Section 10(b) of the Securities Exchange Act or Rule 10b–5 of the Securities and Exchange Commission. The district court ruled that the plaintiffs failed to state a claim upon which relief could be granted as to the Bank, but the court refused to specify the basis for this conclusion. The pendent common law fraud claims contained in the even-numbered Counts were simultaneously dismissed as to the Bank, and final judgment was entered in its favor. This appeal followed.

The Bank's principal argument is that Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5 do not reach this case. On the other hand, in its brief responding to the SEC's *amicus curiae* brief, the Bank con-

fesses that it should be retained as a defendant if the amended complaint charges that it and the other defendants "attempted to peg the market in certain securities and to unload the securities at the higher manipulated prices." Such a characterization of this pleading is justified. For example, paragraphs 8, 9 and 14 of the amended complaint describe just such a scheme, and the Bank is alleged to have rendered active and knowing assistance in creating and maintaining the ensuing credit bubble. Therefore, as the SEC has pointed out, retaining the Bank in this suit would be entirely consonant with the undisputed goal of the Securities Exchange Act to curb uncontrolled speculation on securities markets.

The Bank candidly admits that Section 10(b) contemplates protection for sellers of securities and that plaintiffs "clearly plead having sold securities." Nevertheless, it relies on the language in Section 10(b) limiting the Commission to the promulgation of rules "in the public interest" and urges that there is no public interest in protecting plaintiff brokers. A similar argument was rejected in A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir. 1967),[1] where Section 10(b) and Rule 10b–5 were held applicable to protect brokers against manipulative and deceptive devices. As the Court said (at p. 397):

> "We believe that § 10(b) and Rule 10b–5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws."

There the Court determined that the artificial demand created by purchasing securities which, as here, were not to be paid for unless the market value of the stock rose, could have an unsettling and

1. We approved the *Brod* case in Allico National Corp. v. Amalgamated Meat Cutters and Butcher Workmen of North America, 397 F.2d 727, 730 (7th Cir. 1968).

potentially manipulative effect on the securities market, contrary to the purpose of the 1934 Act. As Judge Kaufman observed, practices like those supposedly engaged in by these defendants "represent a violent form of speculation which serves no useful purpose except that the speculator always holds the trump card." *(Ibid.)*

The Bank urges that the *Brod* case is "an unwarranted extension of the scope of Section 10(b) and Rule 10b–5," but we agree with the Second Circuit that these broad provisions [2] should not be limited to frauds practiced directly on investors. Moreover, it is settled that the Securities Exchange Act is not intended to provide protection only for uninformed or unsophisticated investors. Lehigh Valley Trust Co. v. Central National Bank, 409 F.2d 989 (5th Cir. 1969). The protections and remedies of that Act are not limited to the gullible and unwary for "Fraud may also be perpetrated upon the powerful and the sophisticated." By allowing brokers to sue, speculators will be deterred from using exchanges and the over-the-counter markets for their own purposes at the expense of other investors and the public generally. Surely the victimization of securities dealers by means of manipulative devices, here alleged to have caused large losses to one such dealer and the insolvency of another, may have substantial adverse consequences on customers of such dealers and may impair the confidence of the general investing public as to the integrity and stability of the nation's securities markets. The district court is seemingly in agreement with this conclusion as evidenced by its refusal to dismiss this suit against the other defendants. We perceive no distinction between the Bank and the individual defendants to show that allowing suit to proceed against the Bank would be contrary to or outside the public policies expressed in the Securities Act.

We have recently reiterated that frauds "in connection with" sales of securities are sufficient to invoke the jurisdiction of the 1934 Act and Rule 10b–5 (Buttrey v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 410 F.2d 135 (7th Cir. 1969) [3]) so that the Bank's participation in this credit bubble fraud sufficiently states a claim against it under Section 10(b) and Rule 10b–5. Although the Bank may have neither bought nor sold securities for its own account, it was in a unique position to obtain the necessary time during which it was hoped that the value in the purchased securities would rise sufficiently to allow the participants in the scheme to use them in financing still further purchases. Moreover, as alleged in the amended complaint, the Bank was able to conceal the precarious nature of the speculative purchases by arranging for undisclosed or fictitious persons to bail out certain overdue transactions. Since the Bank was charged with being an aider and abettor in the fraud, it must now meet the merits of that charge. Buttrey v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., *supra* at p. 144; Brennan v. Midwestern United Life Insurance Co., 259 F.Supp. 673, 680–682 (N.D.Ind.1966), 286 F.Supp. 702, 725 (N.D.Ind.1968), appeal pending, No. 17167 (7th Cir. 1968). In our opinion the case alleged against it falls well within the outer limits of Section 10(b) and Rule 10b–5.

The Bank also seeks affirmance on the ground that plaintiffs should not be permitted to recover for bad debts

---

2. "The broad anti-fraud purposes of the statute and the rule" were recently recognized in Securities and Exchange Commission v. National Securities Inc., 393 U.S. 453, 467, 89 S.Ct. 564, 21 L.Ed. 2d 668.

3. Securities and Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833, 853, 859 (2d Cir. 1968), certiorari denied *sub nom.* Kline v. Securities and Exchange Commission, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (April 21, 1969), also recognizes the broad scope of the "in connection with" phrase, labeling it "a catch-all clause to prevent manipulative devices."

resulting from a careless method of handling sales of securities. It urges us to read "the narrow tests prescribed by Section 286 of the Restatement of Torts" into Section 10(b) and Rule 10b–5. That Section deals with implied private rights of action for negligence. Nothing in the legislative history of the statute has been called to our attention to show that Congress intended any such limitation. Although the Bank relies on Kardon v. National Gypsum Co., 69 F. Supp. 512, 513 (E.D.Pa.1946), and Trussell v. United Underwriters, Ltd., 228 F.Supp. 757, 771 (N.D.Colo.1964), those cases denied motions to dismiss; neither held that actions under this statute or rule were to be circumscribed by doctrines of contributory negligence and we also decline so to hold. Whatever the relevance of plaintiffs' negligence might be to the issues at a trial on the merits, it does not support the dismissal of the amended complaint which is based on fraud rather than negligence. The Bank has found no case to support its theory that dismissal was justified because the plaintiffs were contributorily negligent or possessed unclean hands.

■■ Next the Bank argues that it is not "any person" within the purview of Section 10(b) and Rule 10b–5. However, those provisions are intended to be construed flexibly to effectuate the remedial purposes of the securities legislation. Securities and Exchange Commission v. Capital Gains Bureau, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237. Here the Bank, through its officers and directors, is alleged to have knowingly participated in a fraudulent scheme to manipulate the market. In such circumstances, it would distort the purpose of the statute and the rule to exclude the Bank from their applicability to "any person." Cf. Lehigh Valley Trust Co. v. Central National Bank, 409 F.2d 989 (5th Cir. 1969).

■ The Bank also attempts to justify its dismissal on the ground these acts were outside the scope of its agents' authority. This may have been the unarticulated reason why the district court dismissed as to the Bank. However, the plaintiffs have charged that the two chief executive officers and directors of the Bank, a vice president, an assistant vice president, and another director were among the "main participants" with the Bank in this scheme. The complaint alleges numerous misdeeds by the Bank itself, acting through its principal agents. Surely the defendant employees of the Bank were "held out to the public as having authority to act." Minor v. Mechanics Bank, 26 U.S. (1 Pet.) 46, 70, 7 L.Ed. 47. Their alleged acts of processing drafts drawn to its depositors were within the scope of their apparent authority, and the possibility that they may have been acting out of personal motives in delaying these normal transactions or may have been overzealous in their attempts to serve the best interests of their employer does not exempt the Bank's liability for their acts performed in the course of their employment. Reading Fed.R.Civ.P. 8 and 9(b) together, we find no deficiency in the complaint in this regard. See 2A Moore's Federal Practice ¶ 9.03 at 1929–1930 (2d ed. 1968); Carrigan v. California State Legislature, 263 F.2d 560, 565 (9th Cir. 1959), certiorari denied, 359 U.S. 980, 79 S.Ct. 901, 3 L.Ed.2d 929; Restatement of Agency, §§ 261, 262.

■ The pendent common law fraud claims alleged in the even-numbered Counts should also have been sustained under Illinois law. The general rule in Illinois denies recovery for fraud based on a false representation of intention or future conduct, but there is a well recognized exception, where, as here, the false promise or representation of future conduct is claimed to be the scheme used to accomplish the fraud. Howard v. Howe, 61 F.2d 577, 579 (7th Cir. 1932), certiorari denied, 289 U.S. 731, 53 S.Ct. 527, 77 L.Ed. 1480; Willis v. Atkins, 412 Ill. 245, 260, 106 N.E.2d 370 (1952); Roda v. Berko, 401 Ill. 335, 340–341, 81 N.E.2d 912 (1948); cf. Re-

statement of Torts §§ 525, 530.[4] More-over, the amended complaint alleges numerous false statements to the effect that arrangements for payment of drafts had been unavoidably delayed or were then in progress, and counsel for the Bank conceded at oral argument that such statements would, if made as alleged, constitute false statements of fact. As the above cases make clear, even a false representation of intention or future conduct, if amounting to a matter of fact, will support an action for fraud.

Reversed and remanded.

See also, 7 Cir., 380 F.2d 131.

4. Repsold v. New York Life Insurance Co., 216 F.2d 479, 485–486 (7th Cir. 1954), did not consider the *Howard,* *Willis* and *Roda* decisions or the Illinois exception on which plaintiffs rely.